OFFICE OF the PUBLIC COUNSELOR,
Appellant,

v.

INDIANAPOLIS POWER AND LIGHT
COMPANY, Appellee.

No. 2–779A200.

Court of Appeals of Indiana,
Fourth District.

Dec. 22, 1980.

John J. Metts, Deputy Public Counselor, Indianapolis, for appellant.

Christopher J. Weber, Jon D. Noland, Barnes, Hickam, Pantzer & Boyd, Indianapolis, for appellee.

MILLER, Judge.

Appellant, the Office of the Public Counselor (Public Counselor), appeals the order of the Public Service Commission (the Commission) approving the petitioner–appellee's, Indianapolis Power & Light Company (IPALCO), application for an increase in its fuel cost charge for electrical service. Specifically, the Public Counselor attacks the Commission's finding number 4 as supported by insufficient evidence and as being contrary to law. This finding stated that:

"The actual increases in Applicant's fuel costs since the Commission's Order of August 30, 1978, in Cause No. 35132 approving Applicant's present basic rates and charges through April 30, 1979, have not been offset by actual decreases in other operating expenses, and the foregoing fuel cost charge of $.002621 per kilowatt–hour will not result in Applicant earning a return in excess of the return authorized by the Commission in that Order."

We affirm in part and reverse in part for the reasons stated below.

## FACTS AND ISSUES

On May 16, 1979, IPALCO filed with the Commission its application for an increase in its fuel cost charge for electrical service. The required notices were published by the Commission and IPALCO. Also, the required reports were filed with the Public Counselor, the Commission's engineering department and IPALCO. The Commission held a public hearing on IPALCO's application on June 13, 1979. The testimony and exhibits offered at this hearing, which are pertinent to this appeal can be summarized as follows:

IPALCO's last basic rate increase was approved by the Commission through its order dated August 30, 1978. The Commission approved a rate of return equal to 7.25% on a fair value rate base of $993,366,000. The resulting utility income equalled $72,019,000. In arriving at this rate base, the Commission included the Petersburg Unit 3 and the Hanna to Petersburg transmission line neither of which were in service at that time. Significantly, they were valued at their gross original cost.

Returning to the present application, IPALCO sought an increase in the fuel cost charge for electrical service from approximately July 18, 1979 to October 18, 1979. In seeking this increase IPALCO estimated its average fuel cost for July, August and September, 1979, as required by IND.CODE 8–1–2–42(b).[1] Pursuant to IND.CODE 8–

---

1. IC 8–1–2–42(b) provides that:
   "No schedule of rates, tolls and charges of a public municipally–owned or cooperatively– owned utility which includes or authorizes any changes in charges based upon costs is effective without the approval of the commis-

1–2–42(d)(4) these estimates were premised upon IPALCO's actual and estimated fuel costs for February, March and April, 1979.[2]

At the time IPALCO filed this application, April, 1979 was the most recent month for which it knew its actual fuel costs. As a result, IPALCO's pre–filed evidence showed its actual operating revenue, expenses and utility operating income for the twelve month period ending April 30, 1979. The operating revenue was calculated for the first four months at the previous, lower basic rate and the last eight months at the then–current higher basic rate. In calculating its fair value rate base, IPALCO utilized the same procedure as employed by the Commission in analyzing IPALCO's ba-

sic rate increase application the previous August. The Commission had valued the Petersburg Unit 3 and the Hanna to Petersburg transmission line at their gross original cost. This increased its fair value rate base to $1,000,243,000 and decreased its rate of return to 6.36%. The Commission's staff accounting report noted that both calculations were "true and accurate." Nevertheless, this report observed that instead of valuing the Petersburg Unit 3 and the Hanna to Petersburg transmission line at the gross original cost, they could have been valued at the net accumulated depreciation value since they had been in service for a few months. This valuation method would reduce the fair value rate base to $992,360,-

sion. Before the commission approves any changes in the schedule of rates, tolls and charges of an electric utility, which generates and sells electricity, based upon the cost of fuel to generate electricity or upon the cost of fuel included in the cost of purchased electricity, the public counselor shall examine the books and records of the public, municipally–owned or cooperatively–owned generating utility to determine the cost of fuel upon which the proposed charges are based. In addition, before such a fuel cost charge becomes effective, the commission shall hold a summary hearing on the sole issue of the fuel charge. The public counselor shall conduct his review and make a report to the commission within twenty (20) days after the utility's request for the fuel cost charge is filed. The commission shall hold the summary hearing and issue its order within twenty (20) days after it receives the public counselor's report. The provisions of sections 39, 42, 43, 54, 55, 56, 59, 60 and 61 of this chapter concerning the filing, printing and changing of rate schedules and the time required for giving notice of hearing and requiring publication of notice do not apply to such a fuel cost charge or such a summary hearing."

2. IC 8–1–2–42(d) states that:
"An electric generating utility may apply for a change in its fuel charge not more often than each three (3) months. When such application is filed the petitioning utility shall show to the commission its cost of fuel to generate electricity and the cost of fuel included in the cost of purchased electricity, for the period between its last order from the commission approving fuel costs in its basic rates and the latest month for which actual fuel costs are available. The petitioning utility shall also estimate its average fuel costs for the three (3) calendar months subsequent to the expiration of the twenty (20) day peri-

od allowed the commission in subsection (b). The commission shall conduct a formal hearing solely on the fuel cost charge requested in the petition subject to the notice requirements of IND.CODE 8–1–1–8 and shall grant the electric utility the requested fuel cost charge if it finds that:
(1) the electric utility has made every reasonable effort to acquire fuel and generate or purchase power or both so as to provide electricity to its retail customers at the lowest fuel cost reasonably possible;
(2) the actual increases in fuel cost through the latest month for which actual fuel costs are available since the last order of the commission approving basic rates and charges of the electric utility have not been offset by actual decreases in other operating expenses;
(3) the fuel adjustment charge applied for will not result in the electric utility earning a return in excess of the return authorized by the commission in the last proceeding in which the basic rates and charges of the electric utility were approved; provided, however, if the fuel charge applied for will result in the electric utility earning a return in excess of the return authorized by the commission in the last proceeding in which basic rates and charges of the electric utility were approved, the fuel charge applied for will be reduced to the point where no such excess of return will be earned; and
(4) the utility's estimate of its prospective average fuel costs for each such three (3) calendar months are reasonable after taking into consideration (i) the actual fuel costs experienced by the utility during the latest three (3) calendar months for which actual fuel costs are available and (ii) the estimated fuel costs for the same latest three (3) calendar months for which actual fuel costs are available."

000 while increasing the rate of return to 6.41%. Significantly, as noted by this report as well as the testimony of John D. Wilson (IPALCO's controller), utilization of either the gross original cost or the net accumulated depreciation value provided rates of return which were not in excess of the 7.25% rate of return approved by the Commission on August 30, 1978. The Commission's engineering department also filed a report on IPALCO's application. Neither report found any material discrepancies with IPALCO's pre–filed data nor any basis for denying IPALCO's application for an increase in the fuel cost charge.

After properly perfecting its appeal, the Public Counselor raises two issues for our consideration:

1) Is the Commission's finding number 4 supported by sufficient evidence?

2) Is the Commission's finding number 4 contrary to Indiana law?

### DECISION AND DISCUSSION

A. *Issue One*

■■ This Court is reluctant to disturb administrative findings. *Motor Freight Corp. v. Jarvis*, (1975) 163 Ind.App. 442, 324 N.E.2d 500. Generally, a party seeking to overturn an administrative finding has the burden of showing the existence of reversible error due to a lack of substantial facts supporting the finding. *Kinzel v. Rettinger*, (1972) 151 Ind.App. 119, 277 N.E.2d 913; *Thomas Prods. Co. v. Review Bd. of the Ind. Employment Securities Div.*, (1969) 145 Ind. App. 425, 251 N.E.2d 473. In reviewing the sufficiency of the evidence to support a finding made by an administrative agency, this Court will reverse the agency's finding only if it appears from an examination of the evidence in the agency's record of proceedings that the evidentiary basis of the finding was devoid of any probative value or was so meager as to lead to the conclusion that there is no rational basis for the finding. Additionally, we will reverse if it appears that the result of the hearing must have been influenced by an improper consideration. *City of Muncie v. Public Service*

*Comm.*, (1978) Ind.App., 378 N.E.2d 896, *appeal after remand* 396 N.E.2d 927. In conducting this examination, the Court of Appeals may not weigh the evidence. *International Steel Co. v. Review Bd. of Ind. Employment Securities Div.*, (1969) 146 Ind. App. 137, 252 N.E.2d 848.

■ Initially, the Public Counselor attacks the first portion of finding number 4 which stated that "[t]he actual increases in [IPALCO's] fuel costs since the Commission's Order of August 30, 1978, ... approving [IPALCO's] present basic rates and charges through April 30, 1979, have not been offset by actual decreases in other operating expenses, ...." The Public Counselor does not claim that IPALCO's fuel costs had not increased. Further, the Public Counselor has failed to point out any evidence that IPALCO's "other operating expenses" had decreased. Our examination of the record as referenced by the litigant's briefs reveals substantial evidence that the "other operating expenses" had not decreased, but were at the level projected by IPALCO in support of its basic rate increase request the previous August.

The Public Counselor next challenges the second part of finding number 4 which stated that an increased "fuel cost charge of $.002621 per kilowatt–hour will not result in [IPALCO] earning a return in excess of the return authorized by the Commission in" August, 1978. Expert testimony relative to this portion of the finding established that *either* accounting formula for calculating IPALCO's fair value rate basis (i. e., the gross original cost or the net accumulated depreciated value of the Petersburg Unit 3 and the Hanna to Petersburg transmission line) would provide rates of return equalling 6.36% and 6.41% respectively. Either rate is less than the authorized rate of 7.25%. Therefore, our examination of the evidence leads us to conclude that it is sufficient to support finding number 4 and, consequently, the Public Counselor has failed to establish any reversible error in that regard.

B. *Issue Two*

■ The Public Counselor also challenges finding number 4 as contrary to Indiana law. Initially, the Public Counselor argues that this finding violates IND.CODE 8–1–2–6 which provides that:

"(a) The commission shall value all property of every public utility actually used and useful for the convenience of the public at its fair value, giving such consideration as it deems appropriate in each case to all bases of valuation which may be presented or which the commission is authorized to consider by the following provisions of this section. As one [1] of the elements in such valuation the commission shall give weight to the reasonable cost of bringing the property to its then state of efficiency. In making such valuation, the commission may avail itself of any information in possession of the state board of tax commissioners or of any local authorities. The commission may accept any valuation of the physical property made by the interstate commerce commission of any public utility subject to the provisions of this act. (b) The lands of such public utility shall not be valued at a greater amount than the assessed value of said lands exclusive of improvements as valued for taxation. In making such valuation no account shall be taken of presumptive value resting on natural resources independent of any structures in relation thereto, the natural resource itself shall be viewed as the public's property. No account shall be taken of good will for presumptive values growing out of the operation of any utility as a going concern, all such values to rest with the municipality by reason of the special and exclusive grants given such utility enterprises. No account shall be taken of construction costs unless such costs were actually incurred and paid as part of the cost entering into the construction of the utility. All public utility valuations shall be based upon tangible property, that is, such property as has value by reason of construction costs, either in materials purchased or in assembling of materials into structures by the labor or (of) workers and the services of superintendents, including engineers, legal and court costs, accounting systems and transportation costs, and also including insurance and interest charges on capital accounts during the construction period. As an element in determining value the commission may also take into account reproduction costs at current prices, less depreciation, based on the items set forth in the last sentence hereof and shall not include good will, going value, or natural resources.

(c) In determining the amount of allowable operating expenses of a utility, the commission may not take into consideration or approve any expense for institutional or image building advertising, charitable contributions, or political contributions."

The core of the Public Counselor's argument on this point is that IPALCO's assignment of values to the Petersburg Unit 3 and the Hanna to Petersburg transmission line on a gross original cost basis rather than a net accumulated depreciation basis resulted in an unfair value of IPALCO's property.

As a general rule the Public Counselor's argument has merit since a fair valuation of IPALCO's property should include the net accumulated depreciation basis. However, the Commission did not enter a finding as to which basis was utilized. Further, the evidence before the Commission established that *either* basis would provide a rate of return well below the authorized rate of 7.25%. As evidenced by IC 8–1–2–42(d)(3), the rate of return is a key consideration in examining a fuel cost charge increase application. For these reasons we can not hold that finding number 4 violates IC 8–1–2–6 in the manner suggested by the Public Counselor.

■ The final challenge to finding number 4 alleges that it violates the requirement enunciated in *L.S. Ayres & Co. v. Indianapolis Power & Light Co.*, (1976) 169 Ind.App. 652, 351 N.E.2d 814 and thereby

fails to satisfy IC 8–1–2–42(d)(3).[3] *L.S. Ayres & Co.* involved an appeal from an order of the Commission granting an increase in the basic rates charged by IPALCO. The Commission employed a rate base formula which utilized a historical test–year factor as opposed to a future test–year factor. The former factor included IPALCO's Petersburg Plant Number Two which had produced non–jurisdictional energy under a contract with the Indiana & Michigan Electric Company approved by the Federal Power Commission. The value of electricity produced under this contract represented approximately 45% of the Plant's total capacity. Nevertheless, the Commission included the entire value of the Plant in the rate base. L.S. Ayres, the intervenor, claimed the Commission erred by using the historical test–year factor instead of the future test–year factor because only a portion of the relevant historical data was available. Consequently, it argued that utilization of such historical test–year factor would not produce the requisite just and reasonable rates.

In analyzing L.S. Ayres' claim the Second District initially observed that the Commission's decision must "contain specific findings on all the factual determinations material to its ultimate conclusions." *Id.,* at 661, 351 N.E.2d at 822. There are two policies underlying the "basic findings" requirement as it applies to the Commission's rate order. First, the process of formulating basic findings on all material issues assures that the Commission will make a reasoned analysis of the rate increase request so as to avoid arbitrary or ill–considered action. Second, by supplying this Court with its basic findings of fact, we will have before us the Commission's expert reasoning and subtle policy judgments. This substantially diminishes the possibility "of judicial substitution of judgment or complex evidentiary issues and policy determinations." *Id.,* at 662, 351 N.E.2d at 822. Applying this standard of review to the record before it, the Second District remanded to the Commission that portion of the proceedings dealing with the test–year factor and adjustment method for a clear policy and evidentiary statement. *Id.,* at 677, 351 N.E.2d at 830.

In the present case IPALCO used a historical test–year factor which included *actual* revenues from May 1, 1978 to April 30, 1979. However, the basic rate had been effective only since August 30, 1978. As a result, this factor included four months at the previous, lower basic rate. Through an argument similar to L.S Ayres, the Public Counselor attacks this factor as inaccurate claiming that since the basic rate was not effective for the entire historical test–year, IPALCO's stated revenues were too low. If the revenues were too low, the rate of return from an increased fuel cost charge could not have been accurately determined. Consequently, he claims utilization of the historical test–year factor did not produce a "just and reasonable" fuel cost charge. The Public Counselor submits that the proper historical test–year factor should have "annualized" the first four months of the factors at the higher basic rate effective August 30, 1978.

Our analysis of this issue begins with the observation that before the Commission can grant an increase in the fuel cost charge, it must find that the increase will not result in a rate of return above the approved rate. IC 8–1–2–42(d)(3). The Commission made this ultimate finding, but the decision fails to contain basic findings on all the factual determinations material to its ultimate finding. Specifically, the decision is silent as to whether it utilized IPALCO's non–annualized operating revenue and if it did use this data, the Commission's rationale for selecting it. Lacking such findings, we are unable to fulfill our standard of review as enunciated in *L.S. Ayres & Co., supra,* as follows:

> "[T]he selection of a test year and the adoption of an adjustment method are complex issues of regulatory policy which must be resolved in light of the special facts of each case. The statutory scheme reflects the basic legislative policy that these questions of rate making methodol-

---

**3.** See fn.2, *supra,* p. 674.

ogy are best consigned to the Commission's expert judgment. IC 1971, 8–1–2–47 (Burns Code Ed.). The appropriate standard of review therefore limits our inquiry to whether, on the facts of this case, the test–year and adjustment method selected by the Commission were reasonably related to the purpose they were intended to serve–the fixing of "reasonable and just" rates. *Public Serv. Comm'n v. City of Indianapolis* (1956), 235 Ind. 70, 131 N.E.2d 308; *Public Serv. Comm'n v. Indiana Bell Tel. Co.* (1956) 235 Ind. 1, 130 N.E.2d 467. This standard of review does not authorize the substitution of judicial judgment on matters committed to Commission discretion nor does it require that the reviewing tribunal concur in the wisdom or correctness of the Commission's decision. Our function of review is limited to a determination that the actual choice made by the Commission was based on a consideration of the relevant factors and was reasonably related to the discharge of its statutory duty. In other words, we must determine that there has been no clear error in judgment, and that the Commission's action is founded upon a reasonable basis of support in the whole record."

Id. at 675–76, 351 N.E.2d at 830.

Because the Commission failed to make basic findings of fact specifying whether it accepted IPALCO's non–annualized historical test–year figure over the annualized test–year figure advocated by the Public Counselor as well as explaining its rationale for the selected test–year and since this income data is a critical factor in making the ultimate finding (that the fuel cost charge increase will not result in a rate of return above the approved rate of 7.25%) demanded by IC 8–1–2–42(d)(3), we must remand this portion of the proceedings to the Commission for a clear policy and evidentiary statement underlying the Commission's test–year factor.

For the reasons stated above the Commission's order is affirmed in part and reversed in part with that portion remanded for further proceedings consistent with this opinion.

YOUNG, P. J., and CHIPMAN, J., concur.