**INDIANA GAS COMPANY, INC., Appellant,**

v.

**OFFICE OF the UTILITY CONSUMER COUNSELOR, the Citizens Action Coalition (Intervenor Below), and the Indiana Utility Regulatory Commission, Appellees.**

No. 93A02–8906–EX–289 [1].

Court of Appeals of Indiana, Third District.

Aug. 8, 1991.

---

**1.** Consolidated with Nos. 93A02–8909–EX–486, 93A02–8912–EX–666, and 93A02–9003–EX–181.

Daniel W. McGill, Barnes & Thornburg, Ronald E. Christian, Indiana Gas Co., Inc. Indianapolis, for appellant.

Jerry Jacobi, Robert R. Johnson, Office of Utility Consumer Counselor, Indianapolis, for appellees.

Michael A. Mullett, for Citizens Action Coalition of Indiana, Inc.

STATON, Judge.

Indiana Gas Company, Inc. (IGC) appeals several adverse rulings rendered by the Indiana Utility Regulatory Commission (Commission). The appeals were consolidated pursuant to Indiana Rules of Procedure, Appellate Rule 5(B), due to the identity of the issues and parties and for the convenience of the parties and the bench. The contentions of the parties revolve around the Gas Cost Adjustment (GCA) Statute, Indiana Code 8–1–2–42(g) (1988), which we are asked to interpret. While IGC raises a total of ten issues, they may be recast as the following five:

I. Does the "earnings test" found in Indiana Code 8–1–2–42(g)(3)(C) apply only to gas cost increases, or may it also be applied to gas cost decreases?

II. May a gas utility adjust its rate base in a summary GCA proceeding, enabling it to decrease its rate of return percentage and avoid overearnings?

III. Does the "earnings test" found in the GCA statute utilize "return" or "rate of return" as the relevant "overearnings" indicator?

IV. Was the Commission's interim order subject to refund of future overearnings an impermissible retroactive rate order?

V. If the Commission improperly disallowed IGC's revenues in the GCA proceeding, may IGC recoup these costs in future billing of its customers?

We affirm.

IGC is a public utility which provides natural gas to its customers in the State of Indiana. Like other public utilities, it is subject to reasonable regulation by the Commission pursuant to the Public Service Act of 1913 as to its rates, manner of service, and other matters. IC 8–1–2–1 *et seq.* One component of this comprehensive enabling act is the GCA statute. Enacted in 1983, the GCA statute is a legislative response to rapidly escalating fossil fuel prices which were a product of natural gas deregulation and instability in the Middle East. The GCA statute provided a remedy by allowing utilities to pass gas price fluctuations to customers, without which many utilities might have been financially harmed beyond their ability to recover. The statute incorporates a summary procedure whereby the utility can adjust its rates without going through the time and expense of a full-blown rate case.

The regulation of utilities arises out of a "bargain" struck between the utilities and the state. As a quid pro quo for being granted a monopoly in a geographical area for the provision of a particular good or service, the utility is subject to regulation by the state to ensure that it is prudently investing its revenues in order to provide the best and most efficient service possible to the consumer. At the same time, the utility is not permitted to charge rates at the level which its status as a monopolist could command in a free market. Rather, the utility is allowed to earn a "fair rate of return" on its "rate base." *City of Evans-*

*ville v. Southern Indiana Gas and Elec. Co.* (1975), 167 Ind.App. 472, 339 N.E.2d 562, 570. Thus, it becomes the Commission's primary task at periodic rate proceedings to establish a level of rates and charges sufficient to permit the utility to meet its operating expenses plus a return on investment which will compensate its investors. *Id.,* 339 N.E.2d at 568.

The GCA statute, in keeping with this "bargain," contains a similar quid pro quo. Called the "earnings test" in utility parlance, it does not permit the utility to pass through gas costs which would allow it to earn a higher return than that authorized by the Commission in the utility's last rate case.[2] Disputes over the mechanics surrounding the application of the earnings test fueled the controversy and this appeal.

At the time of filing of this appeal, IGC's last rate case had been concluded on September 18, 1987. Pursuant to the evidence introduced in that proceeding, the Commission determined the value of IGC's assets which were used and useful for the convenience of the public as of December 31, 1986. The Commission concluded that the assets had a net original cost[3] of $314,138,-229 and a "fair value" of $408,380,000. These numbers represented the "rate base" of the utility.[4] The Commission authorized a 10.01% rate of return on IGC's original cost rate base and a 7.7% rate of return on its fair value rate base, which resulted in a permissible net operating income (NOI)[5] of approximately $31,446,000.[6]

---

**2.** Indiana Code 8–1–2–42(g)(3)(C) provides:

The commission shall conduct a summary hearing solely on the gas cost adjustment requested in the petition subject to the notice requirements of IC 8–1–1–8 and may grant the gas utility the requested gas cost charge if it finds that:

   \*    \*    \*    \*    \*    \*

(C) The gas cost adjustment applied for will not result, in the case of a public utility, in its earning a return in excess of the return authorized by the commission in the last proceeding in which the basic rates and charges of the public utility were approved; however, if the gas cost adjustment applied for will result in the public utility earning a return in excess of the return authorized by the commission in the last proceeding in which basic rates and charges of the gas utility were approved, the gas cost ad-

justment applied for will be reduced to the point where no such excess of return will be earned.

**3.** "Net original cost" represents the original cost of the assets less accumulated depreciation.

**4.** "Rate base" is defined as the amount of the company's property which is "used and useful" in rendering the service which the particular utility provides. *City of Evansville, supra,* 339 N.E.2d at 569.

**5.** NOI is defined as operating revenues less operating expenses including taxes and is calculated by multiplying the authorized rate of return by the rate base.

**6.** We outlined the theory and method of rate-making more fully in *City of Evansville, supra.*

IGC's largest expense by far is the cost of acquiring gas from its suppliers for resale to its consumers. Annual gas costs of over $270,000,000 were used by the Commission in developing rates. Every three months after the 1987 rate order, IGC filed an application for a rate adjustment pursuant to the GCA statute. Within an application, the utility estimates its gas costs for the future three-month period and reconciles differences between projected and actual gas costs for the prior period. The Office of the Utility Consumer Counselor (UCC) has thirty days to conduct a review of the utility's request and submit a report to the Commission.[7] The Commission then conducts a summary hearing and issues an order within thirty days.

The current state of the energy market has resulted in a significant decrease in gas costs since the 1987 rate order. Accordingly, IGC has sought to use the GCA procedures to pass through gas cost decreases in order to avoid overearnings.[8] In the four GCA proceedings which are the subject of this appeal and which cover the period from June 1, 1989 through May 31, 1990—GCA22, GCA23, GCA24 and GCA25—the Commission found overearnings and ordered that IGC's proposed GCA factors be reduced to reflect revenue refunds of one-fourth the amount of overearnings for each period.[9]

IGC argued that it should not be required to refund overearnings, as it contended that it did not overearn. It argued that earnings calculations should be based upon its current rate base, not that which was determined in 1987. It presented evidence that its original cost rate base had increased from $314,138,229 in 1987 to $340,982,630 in February of 1989, due to investments by the utility in used and useful property since the 1987 rate case. Thus, when compared to the increased rate base, IGC earned rates of return in each period which were less than the 10.01% authorized in the 1987 rate order. Similarly, IGC introduced evidence that its fair value rate base had increased, and therefore rates of return earned in the operative periods were not excessive. In support of this argument, IGC pointed to the language of the earnings test, which disallows a "return in excess of the return authorized by the commission in the last proceeding in which the basic rates and charges of the public utility were approved...." IC 8-1-2-42(g)(3)(C). IGC argued that "return," as used in the earnings test, meant "rate of return" and was expressed as a percentage figure. Consequently, IGC petitioned for a re-evaluation of its rate base as part of the summary GCA proceeding.

The Commission refused to re-evaluate IGC's rate base, as it determined that the word "return" as used in the earnings test meant a dollar figure, not a percentage, and was equivalent to NOI. As IGC's NOI exceeded that authorized in the 1987 rate order, it had overearned. IGC's "GCA factors" were reduced accordingly and new rates were set. The Commission in each case stated that the new rates were interim rates, subject to refund if the utility overearned in the future.

IGC appeals that determination.

---

7. The Citizens Action Coalition (CAC) may intervene to represent the interests of the ratepayers and the public. It chose to do so in these proceedings and is a party to this appeal.

8. "Overearnings" result when the utility earns more than the return authorized in the previous rate case. A simplified explanation of why IGC may overearn when its gas costs decrease is found in the application of the following basic economic equation:

$$\text{Profit} = \text{Revenue} - \text{Expenses}$$

or

$$P = R - E$$

The largest component of E for IGC is the cost of obtaining gas from suppliers in the market. As E decreases due to the decline in gas costs, P increases and the utility overearns.

9. Overearnings for the period prior to each GCA proceeding and the corresponding reduction in GCA factors for the period covered by the proceeding were as follows:

| Proceeding | Overearnings | Reduction in GCA Factors |
|---|---|---|
| GCA22 | $ 111,655 | $111,655 |
| GCA23 | $3,497,300 | $874,325 |
| GCA24 | $ 430,085 | $107,521 |
| GCA25 | $1,876,080 | $469,020 |

Note that the Commission apparently required the full amount of the overearnings to be refunded in GCA22.

In light of the fact that IGC challenges the Commission's order as contrary to law, it is our task to review the administrative proceedings to see that the Commission remains within its jurisdiction and that it conforms to all relevant statutes, standards, and legal principles. *Southern Indiana Gas and Elec. v. Southern Ind. Rural Elec.* (1979), 179 Ind.App. 671, 386 N.E.2d 1017, 1020, *transfer denied.* We also look to see that the order was not the product of the consideration or the failure to consider factors or elements improperly influencing a final decision. *Id.*

## I.

### *Applicability of the Earnings Test*

The threshold issued raised by IGC is whether the earnings test applies where the utility is experiencing gas cost decreases. IGC argues that it does not, as the test was only intended by the legislature to apply where the utility seeks to hide profit increases in the pass through of increased gas costs to consumers. It relies upon the language of the statute, rules of statutory construction, and language in the case of *Office of Public Counselor v. Indianapolis Power and Light Co.* (1980), Ind.App., 413 N.E.2d 672.

IGC argues that the earnings test is inapplicable because GCA factors which reflect a decrease in gas costs can never result in an excess return. In response to this creative proposition and somewhat economically naive argument, the UCC points out several situations where decreases in rates resulting from a decrease in gas costs might still result in an excess return.[10] We note that if it were true that GCA factors reflecting a decrease in gas costs would never result in overearnings, IGC should have no objection to the application of the earnings test in such a situation.

IGC argues that the language of the earnings test evidences its inapplicability to a situation where gas costs have decreased. It points specifically to the phrase "will result" in the earnings test (note 2, *supra* ), arguing that gas cost decreases do not cause overearnings, so the GCA could not "result" in overearnings, because the overearnings did not "result" from the gas costs. As we agreed above with the UCC that it is possible for overearnings to result from decreased gas costs, we find IGC's argument to be without merit.

IGC next argues that the GCA statute was enacted in a climate of upwardly volatile gas prices, evincing a legislative intent that the earnings test applies only to gas cost increases. However, the UCC points out that there is nothing in the statute to indicate such an intent. Merely because gas prices were rising when the statute was enacted does not mean the statute is only to apply in such a situation. Moreover, IGC does not contend that the entire statute does not apply, but only contests the application of the earnings test. We believe that the legislature intended the GCA statute to apply in the event of gas cost decreases, as well as increases. The statute was enacted with a dual purpose: the prevention of irreparable harm to utilities due to gas price fluctuations, while insuring that the utility does not use the GCA proceeding as a vehicle to increase profits above those authorized by the Commission. The statute serves that purpose when it is applied to gas cost decreases, as well as increases.

Finally, IGC quotes the following language from *Office of Public Counselor, supra:*

Our analysis of this issue begins with the observation that before the Commission can grant an *increase* in the fuel cost

---

10. The UCC points out that the decrease in rates may be accompanied by an increase in demand for gas services, thereby increasing return. We would also direct the reader to the basic economic equation which we introduced in footnote 8:

$$P = R - E$$

It is true that a reduction in rates will effect a reduction in R, the revenue portion of the equa-

tion. However, if the reduction in rates is not sufficient to compensate for a greater reduction in E (expenses), a net gain in P (profit) may result. Such an effect would be multiplied if the utility increased its supply of gas in response to an increase in demand. Although this is a simplified explanation, it should suffice to illustrate that IGC is in error.

charge, it must find that the *increase* will not result in a rate of return above the approved rate.

*Id.* at 677 (emphasis added). *Office of Public Counselor* involved the Fuel Adjustment Charge (FAC) statute, which is virtually identical to the GCA statute. IC 8–1–2–42(d).

We attach no special significance to the language quoted by IGC. The court referred to fuel cost increases because the case involved fuel cost increases. The language has no effect on the issue of whether the GCA statute applies to gas cost decreases.

We conclude that the GCA statute applies when a utility experiences gas cost decreases, as well as when it is faced with gas cost increases.

## II.

### Update of Rate Base

■ Having concluded that the GCA statute applies, we address the seminal issue underlying this appeal: whether a gas utility may update its rate base in a GCA proceeding. IGC contends that it may, arguing that it would be unfair to apply the earnings test to an outdated rate base. The Commission found otherwise. We may resolve this issue by an examination of the legislative intent behind the GCA statute.

The GCA statute provides a general description of the nature of a gas cost adjustment proceeding: "The commission shall conduct a *summary* hearing *solely* on the gas cost adjustment requested in the petition subject to the notice requirements of IC 8–1–1–8 . . . ." IC 8–1–2–42(g). (Emphases added). Black's Law Dictionary

notes that the word "summary" when "used in connection with legal proceedings means a short, concise and immediate proceeding." (4th Ed.1968). It similarly describes a "summary proceeding":

> In procedure, proceedings are said to be summary when they are short and simple in comparison with regular proceedings; i.e., in comparison with the proceedings which alone would have been applicable, either in the same or analogous cases, if summary proceedings had not been available.

*Id.*

In keeping with the abbreviated nature of the hearing contemplated by the GCA statute, the Commission is given only sixty (60) days to conduct a review and issue an order on the GCA petition.[11] The UCC has thirty (30) days to review the books of the utility and submit a report to the Commission after the filing of the petition, and the Commission in turn has an additional thirty (30) days to hold the summary hearing and issue an order. The notice provisions applicable to rate cases do not apply to GCA proceedings.

The nature of the hearing, the short time span within which review of the utility's request is to be conducted, and the fact that the hearing is to be focused on the "sole issue of the gas cost adjustment" evidence a clear legislative intent to preclude the use of the GCA proceeding as an abbreviated rate case. After we outlined rate case procedure in *L.S. Ayres & Co. v. Indianapolis Power and Light Co.* (1976), 169 Ind.App. 652, 351 N.E.2d 814, *transfer denied,* we offered the following caveat:

> While this brief summary may indicate that determining a utility's revenue re-

---

**11.** Indiana Code 8–1–2–42(g)(1) provides:

Before the commission approves any changes in the schedule of rates, tolls, and charges of a gas utility based upon the cost of the gas, the utility consumer counselor may examine the books and records of the public, municipally owned, or cooperatively owned gas utility to determine the cost of gas upon which the proposed changes are based. In addition, before such an adjustment to the gas cost charge becomes effective, the commission shall hold a summary hearing on the sole issue of the gas cost adjustment. The utility consumer counselor shall

conduct his review and make a report to the commission within thirty (30) days after the utility's request for the gas cost adjustment is filed. The commission shall hold the summary hearing and issue its order within thirty (30) days after it receives the utility consumer counselor's report. The provisions of sections 39, 42, 43, 54, 55, 56, 59, 60, and 61 of this chapter concerning the filing, printing, and changing of rate schedule and the time required for giving notice of hearing and requiring publication of notice do not apply to such a gas cost adjustment or such a summary hearing.

quirement is a simple, almost mechanical task, the process actually requires extensive examination of the utility's operations and continuing exercises of informed administrative judgment. Throughout the remainder of this opinion, two crucial facts about the rate-making methodology should be observed. First, the determination of a utility's revenue requirement is primarily an exercise in informed regulatory judgment. Second, if that judgment is to be exercised properly, the Commission must examine every aspect of the utility's operations and the economic environment in which the utility functions to ensure that the data it has received are representative of operating conditions that will, or should, prevail in future years.

351 N.E.2d at 821 (footnote omitted). The problems inherent in bootstrapping such a comprehensive review into the summary GCA forum were outlined by the Commission in its order in GCA23:

> All of these factors—the expedited nature of the hearing, the consideration of a single factor such as the cost of gas without consideration of other rate making items and the cap on the use of the procedure if excessive earnings resulted—support the contention that the GCA procedure is an exceptional usage, not a normal rate-making action. This difference between the legislature's actions and Applicant's characterization of the process is significant. General rate making theory as described by Applicant assumes that a full investigation has been made into the necessity of the utility's investments in facilities, the reasonableness of both capital investment and operating cost, and the appropriate rate of return the utility should have the opportunity to earn on its rate base. None of these factors are reviewed within the mechanism nor can they be reviewed within the expedited schedule required

by the statute which provides a maximum of 60 days from the filing of a utility's petition to the issuance of the Commission's order.

IGC quotes language from numerous rate cases indicating that a utility's earnings should be examined in conjunction with its current rate base. However, the present case is not a rate case, but a GCA proceeding. We do not quarrel with the language in those cases, but only point out that the legislature, by enacting the GCA statute, has provided an exception to that rule.[12]

We conclude, as did the Commission, that the time and subject matter constraints imposed by the legislature on the GCA proceeding are simply incompatible with a comprehensive re-evaluation of a gas utility's rate base. Our conclusion is no accident. It is clear that the legislature did not intend the GCA hearing to serve as a substitute for a general rate proceeding. Accordingly, we hold that the Commission did not err in denying IGC the opportunity to introduce evidence on its current rate base.

We recognize that IGC is placed in a position which it perceives to be inequitable, but it is not without a remedy. As was pointed out numerous times by the Commission throughout these proceedings, IGC may file a general rate case to update its rate base. The reason that it chose not to prior to this appeal is not apparent on the face of the record.[13]

### III.

### *What does "return" mean?*

The earnings test in the GCA statute precludes a utility applying for a GCA from "earning a *return* in excess of the *return* authorized by the commission in the last proceeding in which the basic rates and charges of the public utility were ap-

---

12. IGC also argues that the court approved the Commission's revaluation of IPALCO's rate base in *Office of Public Counselor, supra.* However, a close reading of that case reveals that the Commission was merely addressing a mistake which had been made in the valuation of the utility's rate base in the original rate case.

13. It appears that IGC has presently elected to avail itself of this remedy. The UCC alleges in a footnote to its brief that in February of 1990, after this appeal was instituted, IGC filed a general rate case. Appellee's Brief, p. 22.

proved." IC 8-1-2-42(g)(3)(C). (Emphases added). IGC devotes much of its four briefs in this consolidated appeal to the argument that the word "return" means "rate of return." The UCC argues that the Commission correctly determined that "return" refers to the utility's NOI determined in its last rate case.

As we indicated above, IGC's last rate case prior to the proceedings which are the subject of this appeal was concluded on September 18, 1987. In its rate order, the Commission concluded that IGC had an original cost rate base of $314,138,229 and a fair value rate base of $408,380,000. The Commission authorized a 10.01% rate of return on IGC's original cost rate base and a 7.7% rate of return on its fair value rate base, which resulted in a NOI of approximately $31,446,000. Thus, IGC argues that it may earn a 10.01% rate of return on its new original cost rate base as determined in the GCA proceeding. The UCC and the CAC respond that IGC is limited to a return of $31,446,000 until its rate base is revalued in a general rate proceeding in the future.

The significance of this dispute is clear when we examine the nature of the typical utility. Utilities, like many other industries, are continually investing in new equipment. Investment occurs for a number of reasons, including the need to keep up with changing technologies, the ever-increasing demand for efficiency in the use of our fossil fuels, the replacement of equipment subject to normal wear and tear, and the expansion of service to keep pace with the growth of our population centers. Our supreme court noted the ever-changing nature of a utility's rate base in *Boone County R.E.M.C. v. Public Service Commission* (1959), 239 Ind. 525, 159 N.E.2d 121, 125:

> The fact is, the rate base is never the same for any length of time. It changes with every transaction of the utility. It changes from day to day, even from minute to minute, when we consider such influences as depreciation.

Thus, a utility's rate base determined several years ago most likely will not be the same as its rate base today.

At this point, an example becomes instructive. Assume the Commission determines, pursuant to a general rate case, that gas company G has a rate base of $100 in year X. The Commission also finds that G has an authorized rate of return of 10% on its rate base, yielding a NOI of $10. Assume further that G engages in investment activity, and by the year X + 5 has succeeded in building its rate base up to $200.

If we accept IGC's definition of the word "return" in the GCA statute as "rate of return," G may earn up to $20 before it is deemed to be overearning, as this figure does not exceed the authorized *rate of return* determined by the Commission in G's last general rate case. On the other hand, if we accept the UCC's definition, G may still only earn $10—the NOI authorized by the Commission in its last rate case.

Thus, under IGC's interpretation, a utility may increase its profits between rate cases by continually updating its rate base, so long as those profits do not exceed the percentage rate of return set out by the Commission in the prior rate case. Underlying this argument, however, is the assumption that IGC may update its rate base in a summary GCA proceeding. As we indicated in section II of this opinion, this assumption is invalid.

Because a utility may not update its rate base in a GCA proceeding, it does not matter whether "return" means NOI or rate of return—the result is the same. The focus is the rate base as determined in the last rate case. NOI taken as a percentage of that rate base equals the authorized rate of return, and the rate of return multiplied by the rate base equals NOI. Therefore, in our hypothetical example, even in the year X + 5, G could only earn 10% of $100 (the original rate base) or $10. Accordingly, we conclude that the Commission did not err in determining that IGC was only entitled to earn a dollar amount equal to its NOI determined in its last rate case.

## IV.

### Retroactivity

■ IGC argues that the Commission's order setting rates subject to refund of future overearnings was an impermissible retroactive rate order.

Indiana courts have long held that past losses of a utility cannot be recovered from consumers and in turn that consumers may not claim a return of excessive profits and earnings from the utility. *Public Service Commission v. City of Indianapolis* (1956), 235 Ind. 70, 131 N.E.2d 308, 315. This requires the utility to bear losses and allows the utility to reap gains depending upon its managerial efficiency and how it weathers economic uncertainties after rates are fixed. *Id.* The stated rationale for this rule is to retain the impetus of the "invisible hand" described by classical economists as one of the prime benefits of the free market system: [14]

> Were it not so, a premium would be placed upon inefficiency, waste and negligence in management. It is better policy to encourage thriftiness, saving and frugality on the part of a utility management. Such incentive inures eventually to the benefit of the consumers in succeeding rate hearings.

*Id.*

Our courts have generally rooted this prohibition against retroactive ratemaking in the language of the Public Service Act of 1913. *See, e.g., Public Service Indiana, Inc. v. Nichols* (1986), Ind.App., 494 N.E.2d 349, 353, *reh'g denied; Indiana Telephone Corp. v. Public Serv. Com'n of Ind.* (1960), 131 Ind.App. 314, 171 N.E.2d 111, 124. The Commission derives its power and au-

thority solely from statute. *Nichols, supra*, at 353.

We turn to the statute at issue. The pertinent language of the GCA statute requires the Commission find that the GCA applied for will not result in overearnings in order for it to be approved. If the Commission does so find, the statute directs the commission to reduce the GCA to prevent overearnings. IC 8-1-2-42(g)(3)(C). The clear legislative intent is to prevent the utility from overearning, and there is no indication that the resultant rates may not be set as interim rates, subject to refund. The Commission cannot divine the future, so overearning may only be prevented by an examination of the utility's earnings after the fact.

The CAC directs our attention to numerous decisions from other jurisdictions where it was held that the rule against retroactive ratemaking did not bar similar orders in similar proceedings to the case at bar. *See Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1988), 171 Ill.App.3d 948, 121 Ill.Dec. 746, 525 N.E.2d 1053, *appeal denied* 122 Ill.2d 570, 125 Ill.Dec. 211, 530 N.E.2d 239; *MGTC, Inc. v. Public Serv. Co.* (1987), Wyo., 735 P.2d 103; *Equitable Gas Co. v. Pennsylvania Pub. Util. Comm'n* (1987), 106 Pa.Commw. 240, 526 A.2d 823, *appeal denied* 516 Pa. 644, 533 A.2d 714; *Colorado Energy Advocacy Office v. Public Serv. Co.* (1985), Colo., 704 P.2d 298. To this list we would add *State ex rel. Utilities Comm'n v. CF Industries* (1980), 299 N.C. 504, 263 S.E.2d 559. These courts reached their decision by concluding either that the rule against retroactive ratemaking applies only to rate cases and is not applicable in summary fuel or gas

---

**14.** As every individual, therefore, endeavors as much as he can both to employ his capital in the support of domestic industry and so to direct that industry that its produce may be of the greatest value; every individual necessarily labors to render the annual revenue of the society as great as he can. He generally, indeed, neither intends to promote the public interest, nor knows how much he is promoting it. By preferring the support of domestic to that of foreign industry, he intends only his own security; and by directing that industry in such a manner a ,

its produce may be of the greatest value, he intends only his own gain, and he is in this, as in many other cases, led by an invisible hand to promote an end which was no part of his intention. Nor is it always the worse for the society that was no part of it. By pursuing his own interest he frequently promotes that of the society more effectually than when he really intends to promote it.

Adam Smith, *An Inquiry Into The Nature and Causes of The Wealth of Nations,* Book IV, Chapter 2 (1776).

cost adjustment proceedings such as that from which IGC appeals, or that such adjustments were prospective and not retroactive. While generally agreeing with the result reached in all of these cases, we believe the better view under our statute is that the rule against retroactive ratemaking does not apply to GCA proceedings.[15] This court has recognized that the legislature may have authorized retroactive ratemaking under a statute other than the general rate statute. *City of Richmond, supra* n. 14, at 1275. Further, this conclusion is supported by an examination of the policies underlying the rule against retroactive ratemaking. The policy favoring the promotion of efficiency is not served if the increased profits gained by the utility are solely the result of fluctuations in the gas price.

We therefore hold that the Commission's order directing that the rates were interim and subject to refund was a permissible means to effectuate the legislative intent that utilities not overearn as a result of the GCA procedure. We further hold that the order does not violate the rule against retroactive ratemaking.

## V.

### *Recapture of Gas Costs*

IGC contends that if the Commission improperly disallowed IGC's revenues in the GCA proceeding, it may recoup these costs in future billing of its customers. Since we concluded above that the Commission did not improperly disallow revenues, we need not address this issue.

The order of the Commission is in all things affirmed.

GARRARD and BUCHANAN, JJ., concur.

---

**15.** We note, however, that there is some authority that an order similar to that in the present case providing for a future refund of monies received by the utility is prospective, not retroactive. *City of Richmond v. Public Serv. Com'n* (1980), Ind.App., 406 N.E.2d 1269, 1275, *transfer denied.*