**In re: the Matter of CITY OF CLINTON WATER WORKS RATE SCHEDULE ADOPTED SEPTEMBER 9, 1997.**

**Clinton Township Water Co., Inc., Appellant–Petitioner,**

v.

**City of Clinton, Department of Water Works, Appellee–Respondent.**

No. 83A04–9805–CV–248.

Court of Appeals of Indiana.

March 18, 1999.

Bette J. Dodd, Lewis & Kappes, Indianapolis, Indiana, Timothy Fears, Wright, Shagley & Lowery, Terre Haute, Indiana, attorneys for appellant.

Henry L. Antonini, Antonini & Antonini, Clinton, Indiana, attorney for appellee.

## OPINION

KIRSCH, Judge.

Clinton Township Water Co., Inc. (Township), appeals the trial court's confirmation of a rate increase for water service provided by the City of Clinton, Department of Water Works (City). The issues presented on appeal are:

I. Whether the trial court applied the proper legal standard for evaluating the rate increase.

II. Whether the trial court properly concluded that the rate increase was non-discriminatory, reasonable, and just.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On September 9, 1997, the Common Council of the City of Clinton adopted an ordinance setting forth an increase in the City's water rates, the first such increase in nearly ten years. The Township, the City's only wholesale customer, was to incur a 166% increase in its rates while the City's residential customers were to incur a 100% increase in their rates. These respective increases resulted in the Township paying the same rates as the residential customers which it had not been required to do prior to the rate increase. The Township filed a petition in which it objected to the rate increase, claiming it violated IC 8–1.5–3–8. The trial court held a hearing on the Township's petition and confirmed the City's rate increase. In reaching its decision, the court entered findings and conclusions, which provide in pertinent part as follows:

"1. The City of Clinton is a municipality of the State of Indiana who owns and operates a water utility providing water service to members of the public both within and outside the City's municipal limits.

2. Clinton Township Water Company, Inc. is a non-profit water utility and is [a] wholesale customer of the City of Clinton.

3. That City was taken out of the jurisdiction of the Indiana Utilities Regulatory Commission for the approval of rates and charges pursuant to IC 8–1.5–3–9.

4. That City held a public hearing for the purpose of allowing interested persons to be heard concerning rates and charges. . . .

. . . . [1]

7. That after the hearing the City Council adopted an ordinance establishing the water rates and charges pursuant to IC 8–1.5–3–8.1.

8. That it costs the City .79 cents per 1000 gallons of water to produce the water sold. That Respondent is paying .63 cents per gallon[ ] for water purchased by them.

9. That the City Water Utility has working capital representing approximately one month of operations and had a net income in 1997 of $15,430.00.

10. That the City Water Utility has nothing in its old rates to include a reasonable rate of return on the utility plant.

11. That the outstanding balance of the hydrant rental receivable is $160,872 as of December 1997.

12. That the following projects are recommended and/or necessary within the next ten years to maintain the utility property in a sound physical and financial condition to render adequate and efficient service:

a) construction of a 500,000 gallon holding tank at a cost of $750,000.

b) replacement of old water mains and meters at a cost of not less than $1,000,000.00 or as much as $5,000,-000.00[.]

c) valve replacements at a cost of $100,000.00 per year for 10 years plus a cost for plugs @ $75,000.00.

d) provide well head protection to comply with IDEM within two years at a cost of $35,000.00 to $55,000.00[.]

and that there are no provisions in the old rate to provide adequate money for making these extensions and replacements.

13. That given the significant percentage increase in Respondent's rate, the new rate is well within the range of rates currently charged by those water utilities in the area surrounding Vermillion County.

**CONCLUSIONS OF LAW**

. . . .

2. That the old water rates in effect prior to the new ordinance did not produce an income sufficient to maintain the utility property in a sound physical and financial condition to render adequate and efficient water service.

3. That the new water rates established by the City are non-discriminating, reasonable and just pursuant to IC 8–1.5–3–8.

It is therefore ORDERED that the new water rate established by the ordinance enacted by the Clinton City Council is confirmed."

*Record* at 78–80. The Township appeals.

**DISCUSSION AND DECISION**

■■■■ On appeal, the trial court's findings and conclusions will not be set aside unless clearly erroneous. Ind. Trial Rule 52(A). When determining whether the trial court's findings and conclusions are clearly erroneous, we consider whether the evidence supports the findings and whether the findings support the judgment. *Chidester v. City of Hobart*, 631 N.E.2d 908, 909 (Ind.1994). We will disturb the judgment only where there is no evidence to support the findings or the findings fail to support the judgment. *Id.* We will not reweigh the evidence, but will consider the evidence most favorable to the trial court's judgment together with all reasonable inferences arising therefrom. *Id.*

**I. Proper Legal Standard**

■■■ Pursuant to IC 8–1.5–3–9, the City has removed itself from the jurisdiction of the Utility Regulatory Commission (IURC). Notwithstanding such removal, the Township argues that the City was required to justify the rate increase by using the same rate-making methods and procedures followed by utilities subject to the IURC's jurisdiction. All of the cases the Township cites in support of its position involve utilities subject to the jurisdiction of the IURC for approval of rates

1. The omitted portion of the findings relate to the adequacy of the notice of the public hearing, a matter not at issue on appeal.

and charges. *See City of Logansport v. Public Serv. Comm'n,*[2] 202 Ind. 523, 177 N.E. 249 (1931); *Indiana Gas Co. v. Office of Utility Consumer Counselor,* 575 N.E.2d 1044 (Ind. Ct.App.1991); *Capital Improvement Bd. of Managers of Marion County v. Public Serv. Comm'n,* 176 Ind.App. 240, 375 N.E.2d 616 (1978); *L.S. Ayres & Co. v. Indianapolis Power & Light Co.,* 169 Ind.App. 652, 351 N.E.2d 814 (1976). Based upon these cases, the Township advocates an historical test-year rate-making method. This method is not mandated, but has been "generally accepted" in cases before the IURC. *See Capital Improvement Board,* 176 Ind.App. at 257, 375 N.E.2d at 630.

■ Nothing in the case law or in the applicable statutes mandates a certain type of rate-making method for municipal utilities that have removed themselves from the jurisdiction of the IURC. Indeed, when a municipal utility removes itself from that jurisdiction, as the City has done here, the IURC's authority is replaced by local control. *Stucker Fork Conservancy Dist. v. Indiana Utility Regulatory Comm'n,* 600 N.E.2d 955, 959 n. 9 (Ind.Ct.App.1992). Thus, we conclude that the City in support of its rate increase was not limited to methodologies generally accepted by the IURC.

■ We also reject the Township's argument that the City is not permitted to raise rates to cover future expenses. Again, nothing in the case law or applicable statutes prevents a municipality that has removed itself from the jurisdiction of the IURC from doing what the City seeks to do here—that is, raise utility rates in order to generate revenue for repairs, replacements and upgrades, so that the expenses can be paid as they are incurred. The City is not required to incur debt to finance these projects.

## II. Sufficiency of Evidence to Support Rate Increase

■ Although not required to use any particular rate-making method, a municipal utility that has removed itself from the jurisdiction of the IURC is still required to make rates that are nondiscriminatory, reasonable, and just within the meaning of IC 8–1.5–3–8. *See* IC 8–1.5–3–8.1(b). As is relevant to the challenges made in the present appeal, IC 8–1.5–3–8 provides:

"(a) A municipality owning a utility under this chapter shall furnish reasonably adequate services and facilities.

(b) The rates and charges made by a municipality for a service rendered or to be rendered, either directly or in connection therewith, must be nondiscriminatory, reasonable, and just.

(c) 'Reasonable and just rates and charges for services' means rates and charges that produce sufficient revenue to:

(1) pay all the legal and other necessary expenses incident to the operation of the utility, including:

    (A) maintenance costs;

    (B) operating charges;

    (C) upkeep;

    (D) repairs;

    (E) depreciation; and

    (F) interest charges on bonds or other obligations, including leases;

(2) provide a sinking fund for the liquidation of bonds or other obligations, including leases;

(3) provide a debt service reserve for bonds or other obligations, including leases, in an amount established by the municipality, not to exceed the maximum annual debt service on the bonds or obligations or the maximum annual lease rentals;

(4) provide adequate money for working capital;

(5) provide adequate money for making extensions and replacements to the extent not provided for through depreciation in subdivision (1); and

(6) provide money for the payment of any taxes that may be assessed against the utility.

---

2. The Public Service Commission was renamed the IURC in 1987. *See* IC 8–1–1–7; Pub.L. No. 113–1987; *Howell v. Indiana–American Water Co.,* 668 N.E.2d 1272, 1275 n. 3 (Ind.Ct.App. 1996), *trans. denied* (1997).

(d) It is the intent of this section that the rates and charges produce an income sufficient to maintain the utility property in a sound physical and financial condition to render adequate and efficient service. Rates and charges too low to meet these requirements are unlawful."

Upon proper written objection, the trial court determines the reasonableness of rates set by a municipal utility that has removed itself from the jurisdiction of the IURC. IC 8–1.5–3–8.2.

■ The Township makes a variety of arguments concerning the trial court's conclusion that the City's rate increase was just, reasonable, and nondiscriminatory. All of these arguments can be resolved by determining whether the evidence supports the trial court's findings and whether the findings support the judgment.

To make these determinations, we look first to the statutory requirements imposed on a municipally owned utility. The City is required to provide its customers with reasonably adequate services and facilities. IC 8–1.5–3–8(a). The legislature has empowered municipalities who own utilities to implement rates and charges that produce enough income to maintain a physically and financially sound utility so that it may render adequate and sufficient services. IC 8–1.5–3–8(d).

The City presented evidence to the trial court establishing that the services and facilities currently provided to its customers are inadequate and that the present financial condition of the utility is unsound. A civil engineer testified on behalf of the City that a $15,000 repair was necessary for one of the pumps and that seventeen miles of water main, which had been installed in the early part of this century, needed to be replaced at a cost of four to five million dollars. *Record* at 420.

The engineer further acknowledged that the standard practice for Indiana water utilities is to store a twenty-four-hour supply of water in case of a power outage. The Indiana Department of Environmental Management (IDEM) also recommended in a 1995 survey that the City maintain such a level of water storage. The City pumps about 800,000 gallons of water per day, but has a storage capacity of only 400,000 gallons. To bring itself up to industry standards, the City would need to construct a new 500,000 gallon storage tank. *Record* at 422. The accountant hired by the City to perform a financial forecast assumed an approximate cost of $750,000 for construction of a new storage tank. *Record* at 347.

The engineer also testified that a recent fire tragically illustrated the poor condition of the utility and that "most of the valves in town don't work." *Record* at 423. To "at least get the system back up to a minimum level," twenty-five percent of the valves would have to be replaced which would cost $20,000 per year for five years. *Record* at 423–24. The same fire revealed that the City's fire hydrants were faulty and needed to be replaced at a cost of $2,000 to $2,500 each for a total cost of $70,000 to $80,000. *Record* at 424. In addition, the 1995 IDEM survey recommended a well head protection program, which the engineer estimated would cost an additional $35,000 to $50,000. *Record* at 425.

Reed O'Hare, the accountant who regularly performs the City's accounting, testified that typically a depreciation fund is used to finance future improvements. *Record* at 294. That fund currently contains $29.00 which the accountant testified was insufficient to make repairs. Moreover, the City does not currently have any other accounts set up to fund any of the categories listed in IC 8–1.5–3–8(c)(1)–(6) (maintenance costs, operating charges, upkeep, repairs, depreciation, and interest charges on bonds or other obligations, including leases, sinking fund for liquidation of bonds or other obligations, debt service reserve, adequate money for working capital, adequate money for making extensions and replacements, money for payment of taxes).

O'Hare also testified that the City's net income for 1997 was $15,430. *Record* at 301. He further testified that while it currently costs the City seventy-nine cents per 1,000 gallons to produce the water, the Township only pays sixty-three cents per 1,000 gallons, much less than the City's cost of production.

Prior to the rate increase, the Township, a wholesale customer, paid lower rates than residential customers. These lower rates were instituted pursuant to a contract between the City and the Township entered into in 1985. When the ten-year contract expired in 1995, attempts at renegotiation were unsuccessful. After the rate increase, all of the City's water customers, wholesale and residential customers alike, pay the same rate, with discounts permitted based upon the quantity used. While this has resulted in a higher increase in the Township's rates as compared to the residential customers, this disparity does not render the rate increase discriminatory, unreasonable, or unjust. The rate increase simply requires the Township to pay the same rate as the City's other customers. The greater percentage increase was required by the fact that the Township's pre-increase rate was less than the City's cost to produce the water sold. In addition, the Township will receive a volume discount which will result in its average cost per gallon being less than that paid by residential customers.

Having reviewed the Record and the evidence presented to the trial court, we hold that the evidence supports the trial court's findings and the findings support the trial court's judgment confirming the water rate increase.

Affirmed.

FRIEDLANDER, J., and MATTINGLY, J., concur.