PUBLIC SERVICE COMMISSION OF MARYLAND
ET AL. *v.* DELMARVA POWER & LIGHT
COMPANY OF MARYLAND

[No. 1077, September Term, 1978.]

*Decided May 11, 1979.*

The cause was argued before GILBERT, C. J., and MOORE and LISS, JJ.

*James A. Pine* and *Kirk J. Emge,* with whom were *Allen M. Freifeld* and *John B. Gontrum* on the brief, for appellant Public Service Commission of Maryland. *Gary R. Alexander,* with whom were *John K. Keane, Jr.,* and *Philip S. Shapiro* on the brief, for other appellant.

*John W. T. Webb,* with whom were *David A. Vorhis* and *Webb, Burnett & Duvall* on the brief, for appellee.

LISS, J., delivered the opinion of the Court.

This case results from an appeal by the Public Service Commission of Maryland, hereinafter the Commission, from an order of the Circuit Court for Dorchester County reversing on appeal an order of the Commission directing the Delmarva Power and Light Company, hereinafter Delmarva, to refund to its retail customers an alleged overcharge by Delmarva in the amount of $125,000.00. The original order of the Commission was issued at the conclusion of extensive hearings before a Commission hearing examiner and after a full hearing before the Commission itself. The original order included several other decisions by the Commission involving the manner of determining future fuel rate adjustment charges of Delmarva customers; however, no appeal was filed by Delmarva with respect to those other portions of the Commission's order. The only question on appeal is the validity of the Commission's order directing the refund.

Case No. 6759 dated April 24, 1974 was instituted by the Commission on its own motion for the purpose of investigating the Fuel Rate Adjustment clauses, hereinafter FRA, of all Maryland gas and electric public utility companies. The purpose of the FRA clause which has been used in Maryland for a number of years is to compensate for an increase or decrease in the cost of fuel used to generate electricity. The fluctuations in a company's fuel costs are reflected in its rates by means of an FRA adjustment provision. A typical FRA clause is stated in terms of a formula whereby a mathematical calculation from designated book figures each month establishes the fuel adjustment rate to be applied to a customer's bill in a particular month. The fuel

adjustment rate added to or subtracted from the base rate determines the charge per kilowatt hour which the customer will pay. The FRA clause, therefore, automatically adjusts each customer's monthly bill upward or downward in accordance with the company's fuel expenses and permits a more rapid recognition and recovery of fluctuating fuel costs than would be possible in a base rate proceeding.[1] The FRA clause worked satisfactorily for a number of years, but the rapidly rising costs of oil imposed by the OPEC cartel and parallel increases in the cost of coal raised an understandable howl of protest which caused the Governor of Maryland, the members of the Legislature, citizens' groups and consumers to complain bitterly over the effect of the FRA on the spiraling cost of electric service in Maryland and throughout the country.

In response to this concern, the Commission began its investigation into the operation of fuel rate adjustment clauses in Maryland. The Commission initially directed each of the electric companies subject to its jurisdiction to submit responses to twenty-three questions, propounded by the Commission, which were designed to elicit detailed data concerning the operation of each company's FRA. The People's Counsel of Maryland additionally requested answers to thirty-one questions covering the same area of investigation. Responses to both sets of questions were filed by each of the gas and electric utilities under the Commission's jurisdiction.

In March of 1975, the Commission engaged the services of an independent accounting firm, Haskins and Sells, to review the activities of Delmarva, as well as the other utilities not involved in this case relative to the manner of procurement

---

1. The Public Service Commission law, Maryland Code (1957, 1975 Repl. Vol.) Art. 78, permits a regulated public utility to apply to the Commission periodically for a change in its base rates to the level required to fulfill current obligations for labor, depreciation, taxes, materials, and supplies and to earn a fair and reasonable return on its investment. A change in base rates requires lengthy evidentiary hearings with testimony from company officials and outside expert witnesses with similar witnesses being presented on behalf of People's Counsel, intervenors and the Commission staff. These hearings frequently result in regulatory lag and the FRA clauses were intended to bypass the delay of adjustment in recovering increases in fuel costs.

of fuel used in the generation of electric power and the manner of computing costs in the billing of adjusted fuel costs to the companies' retail customers.

A report on the activities of Delmarva was submitted by Haskins and Sells on June 24, 1975, and on July 7, 1975, the Commission issued an order requiring Delmarva to file with the Commission a plan for returning to Maryland customers the sum of $400,000.00 which the Commission found was received as an overpayment by Delmarva by reason of the method of computation of the fuel rate adjustment.

The FRA clause at issue in this case was initially filed with the Commission by Delmarva on April 12, 1972. Subsequently, in two successive rate increase cases filed by Delmarva in 1974 and 1976, the identical FRA clause was filed as a part of the company's tariffs. The FRA clause remained in effect from its inception in October of 1972 until Delmarva filed a revised clause on December 27, 1976 which was accepted by the Commission and became effective on January 31, 1977.

The clause in effect from October of 1972 until December of 1976 provided as follows:

> The price per kwh of electricity sold will be adjusted each month to reflect changes in the cost of fuel above or below the base cost of 3.52 mills per kwh.
>
> The monthly fuel cost will be the total Delmarva System fossil fuel expense cleared during the second preceding month from FPC Account 151 to Accounts 501 and 547 expressed as mills per kwh of net Delmarva System fossil fuel generation increased by 5% to compensate for system losses.
>
> The adjustment in mills per kwh applied to sales *shall be the difference between the monthly and base fuel costs, multiplied by the ratio of Delmarva's System fossil fuel net generation to total net generation.* (emphasis supplied.)

The bone of contention between Delmarva and the Commission concerned the proper treatment to be accorded

to power produced as a result of *nuclear test* generation by the Company in bringing the nuclear plant at Peach Bottom into commercial operation as part of Delmarva's system.

Judge Edmondson, the trial judge, accurately and concisely stated the basis of the dispute when he said in his memorandum opinion:

> In calculating "total net generation" for purposes of developing the ratio between fossil fuel net generation and total net generation, Delmarva did not include the test generation from nuclear stations until they were fully tested and operational. This resulted in a higher ratio between fossil fuel and total generation than would have been the case if the test generation had been included in calculating the total, and accordingly resulted in a higher fuel cost for purposes of application of the fuel adjustment clause. Haskins & Sells pointed out in its report that Delmarva's exclusion of nuclear test generation resulted in the collection of approximately $400,000 more in fuel revenue than would have been the case if nuclear test generation had been included to calculate the ratio. Of the $400,000 which Haskins & Sells calculated to be the difference in FRA revenues depending on whether nuclear test generation was included or excluded, $275,000 was effectively returned to the customers through lower rates before Delmarva's next rate proceeding was concluded, so that Order No. 62552 directed Delmarva to refund only the remaining difference of $125,000.

The hearing examiner of the Commission after extensive hearings filed a proposed order which included a provision that Delmarva be required to refund $125,000.00 to its retail customers. On August 30, 1977, the Commission adopted the recommendation of the hearing examiner. It should be noted that the hearing examiner's proposed order required the inclusion of nuclear test generation in all future computations of Delmarva's FRA, and that the Commission included this

recommendation in its order. It should also be noted that Delmarva, in anticipation of the Commission's order, had already filed an adjustment in its FRA computation prior to the issuance of that order. There is, therefore, no pending appeal from that portion of the Commission's order. Delmarva appealed only that portion of the Commission's order which directed it to refund $125,000.00 to the Circuit Court for Dorchester County. After a hearing and argument, the trial judge reversed the Commission on the basis that "this Court is unable to reach the factual conclusion the Commission reached. It is also unable to find any express or implied law or authority to sustain the Commission's action and concludes that the Commission did not have the power to order the refund in question." It is from that order that this appeal was filed.

The issues raised by the appeal may be stated as follows:

1. During the period in question did Delmarva's tariffs require the inclusion of nuclear test generation in the computation of its FRA clause?

2. Was there substantial evidence in the record considered as a whole to support the Commission's order for refund?

3. Was the order for refund under the circumstances of this case within the statutory authority of the Commission?

We shall answer each of these questions in the affirmative and shall reverse the trial judge's order.

These issues are so inextricably entwined that we shall consider them together. The Commission contends that its authority to require the refund ordered in this case is inherent in Article 78 of the Annotated Code of Maryland.

Code (1957, 1975 Repl. Vol.) Art. 78, Sec. 27 (a) (2) provides:

> (a) *Prohibited Acts* — No public service company shall in its utility operations:
> (2) Demand or collect a greater or less compensation for any service or commodity than specified therefor in its schedules as in force at the time.

Code (1957, 1975 Repl. Vol., 1978 Cum. Supp.) Art. 78, Sec. 56 gives the Public Service Commission broad general

supervision of the activities of public utilities in the following language:

> The Commission shall supervise and regulate all public service companies subject to its jurisdiction to assure their operation in the interest of the public and to promote adequate, economical and efficient delivery of utility services in the State without unjust discrimination, giving consideration to the public safety, the economy of the State, the conservation of natural resources, and the preservation of environmental quality. To these ends the Commission shall enforce compliance by such companies with all the requirements of law, including, but not limited to requirements with respect to financial condition, capitalization, franchises, plant, manner of operation, rates and service. The powers and duties enumerated specifically in this subtitle are not intended to limit the scope of the general powers and duties of the Commission provided for by this Article.

Code (1957, 1975 Repl. Vol.) Art. 78, Sec. 1 requires that the powers of the Commission shall be liberally construed and spells out the overall authority of the Commission as follows:

> The jurisdiction and powers of the Public Service Commission shall extend to all public service companies, as hereinafter provided, to the full extent permitted by the Constitution and laws of the United States. The powers of the Commission shall be liberally construed; and the Commission shall have the powers specifically conferred by this Article and by any other law, and also all implied and incidental powers necessary and proper to carry out effectually the provisions of this article.

Code (1957, 1975 Repl. Vol.) Art. 78, Sec. 97 specifies the scope of judicial review of Commission decisions and provides that:

> Every final decision, order, rule or regulation of the Commission shall be prima facie correct and shall

be affirmed unless clearly shown to be (1) in violation of constitution provisions, or (2) not within the statutory authority or jurisdiction of the Commission, or (3) made upon unlawful procedure, or (4) arbitrary or capricious, or (5) affected by other error of law, or (6) if the subject of review is an order entered in a contested case after hearing, such order is unsupported by substantial evidence on the record considered as a whole.

The Court of Appeals has on many occasions noted that the decisions of the Commission are *prima facie* correct, and that the burden of proof is on the party seeking to set aside an order to show by clear and satisfactory evidence that the Commission's decision is unreasonable or unlawful. *See Baltimore Gas & Electric Co. v. McQuaid,* 220 Md. 373, 152 A. 2d 825 (1959); *Montgomery County v. Public Service Commission,* 203 Md. 79, 98 A. 2d 15 (1953). As the Court has said, the reviewing court does not sit as a "board of revision," *Baltimore Transit Co. v. Public Service Commission,* 206 Md. 533, 558, 112 A. 2d 687 (1955); "it will not substitute its judgment for that of the Commission," *Public Service Commission v. Baltimore Gas & Electric Co.,* 273 Md. 357, 362, 329 A. 2d 691 (1974); and the reviewing court must accord to the Commission's decision "the respect due an informed body aided by a competent and experienced staff," *Baltimore Transit, supra,* at 558. Former Chief Judge Hammond articulated the standards of judicial review in *Insurance Commissioner v. National Bureau,* 248 Md. 292, 236 A. 2d 282 (1967) when he said:

There are differences but they are slight and under any of the standards the judicial review essentially should be limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. This need not and must not be either judicial fact-finding or a substitution of judicial judgment for agency judgment.

*Accord, Public Service Commission, supra; Brotherhood v. B & O.R.R.,* 248 Md. 580, 238 A. 2d 516 (1968).

Delmarva urges that the record discloses that its calculations were in complete conformity with the FRA clause filed by Delmarva with the Commission in 1972 and in effect during the period of 1974 which is here in controversy. Delmarva contends that to change the method of calculation retroactively from the approved and effective method in existence at that time would constitute "the forbidden practice of retroactive rate making." *Public Service Commission v. Baltimore Gas & Electric Co.,* 40 Md. App. 490, 393 A. 2d 1973 (1978).

Delmarva further contends that its interpretation of its FRA clause as requiring exclusion of nuclear test generation was reasonable, in conformity with the language of the clause, consistent with the treatment of its fossil fuel test generation as mandated by the FRA clause, and implicitly approved by the Commission's acceptance of that method of calculation in Delmarva's previous rate case. Finally, the appellee contends there was no evidence to support a finding of a miscalculation of its rates under the effective FRA clause.

The appellee suggests that the propriety of its calculations is dependent on the construction of its FRA clause, and that construction should be considered in the light of the oft-stated rule that in the interpretation of a clause in a contract the court must look first at the language of the clause, and then if there is ambiguity, the court must look at the historic interpretation and application of the clause to resolve the ambiguity. *See Walker v. Associated Dry Goods Corp.,* 231 Md. 168, 189 A. 2d 91 (1963); *Mattingly Lumber Co. v. Equitable Bldg. & Sav. Ass'n,* 176 Md. 403, 5 A. 2d 458 (1939); 17 Am. Jur. 2d *Contracts,* Sec. 274 (1964).

We conclude that the general principles of contract construction as expressed by the appellee are inapplicable in the case at bar. The fuel adjustment clause as filed by Delmarva was not the result of bargaining between the utility and the Commission, as expressed in a contractual agreement, but rather was an integral part of the company's

tariff. *See American Telephone and Telegraph Co. v. Florida Texas Freight, Inc.,* 357 F. Supp. 977 (S.D. Fla. 1973). In the present case, the rate with which we are concerned was under the jurisdiction of the Commission and was subject to revision pursuant to the Commission's authority.

In effect, Delmarva contends that by reason of the Commission's failure to question Delmarva's interpretation of the FRA clause filed in 1972 until the Commission's initiation of the generic investigation in this case, that the Commission was without power to order the refund in this case.

We do not agree. We note that it was Delmarva's unilateral, internal, administrative decision to exclude from its calculations of the total net generation of its system the factor of the power generated during the test generation period immediately prior to the bringing of those nuclear generators into commercial use. This decision was never specifically brought to the attention of the Commission by Delmarva, nor does it appear that the Commission knew of the Company's position on this matter until the report of Haskins and Sells disclosed Delmarva's position to the Commission.

Delmarva argued before the Commission and before us that the acceptance by the Commission of its FRA clause which permitted the exclusion of test generation of power in its fossil fuel generation authorized the identical treatment of nuclear test generation. Delmarva contends that the Haskins and Sells report supports its position that the undisputed evidence disclosed that the Company's fuel adjustment calculations conformed fully to the express language of the FRA as filed with the Commission, and that Haskins and Sells recommended, at the most, that the recognition of nuclear test generation in determining total net generation was a preferable approach to be adopted for the future. Delmarva offered as further support of its position the failure of the Haskins and Sells report to recommend the imposition of a refund. We held in the recent case of *Public Service Commission v. Baltimore Gas & Electric Co., supra,* that the failure of Haskins and Sells, in a similar case, to recommend refunds was not an indication that no evidence

was present to support the Commission's refund order. We quoted with approval from the trial court's opinion as follows:

The Company asserts that Order No. 62300 requiring it to make refunds to its customers was not supported by substantial evidence and was arbitrary and capricious. The reason it puts forth for this assertion is that no witness, not even the expert witness of the Commission, Haskins and Sells, testified that, under the circumstances, a refund should be ordered. This Court thinks that this contention confuses the evidence with the action to be taken on it. The Commission certainly had before it substantial evidence on which to base a finding that the Company had over-recovered its fuel costs under the three-part fuel rate adjustment clause. It was peculiarly within the province of the Commission to decide what action it should take on the basis of the finding and it was not bound to follow a policy recommendation by its expert witness. . . .

The Haskins and Sells report specifically found that Delmarva had miscalculated its fuel adjustment revenues. It so stated in express language when it reported:

However, regarding Step 4, DELMARVA received test generation from Peach Bottom Nuclear Units Nos. 2 and 3 during 1974. DELMARVA owns approximately 7.5% of Peach Bottom Unit No. 2 and Peach Bottom No. 3; Peach Bottom Unit No. 2 became commercial in July 1974, and Peach Bottom Unit No. 3 became commercial in December 1974. The Company did not consider the test generation from these nuclear units prior to commercial operation to be "generation" and therefore excluded such generation from the foregoing monthly calculations. The effect of the exclusion produced monthly ratios of system fossil fuel generation to total system generation which were higher than if such test generation had been included. By applying

the higher ratios to the fossil fuel differential in Step 4, higher fuel adjustment factors resulted, which produced approximately $400,000 of additional fuel adjustment clause revenues in Maryland.

We believe that test generation during 1974 *should have been included in the monthly calculations of the fuel adjustment factors* to prevent an over recovery of fuel costs. (emphasis supplied.)

In effect, Haskins and Sells declined to make any recommendation as to refund because it recognized that the question of refund was a policy decision to be made by the Commission. Haskins and Sells' recommendation that future nuclear test generation be included in the calculation for determining total net generation was entirely consistent with its conclusion that Delmarva had incorrectly excluded nuclear test generation results from its calculation of total net generation in the 1974 period which was in dispute. It is fair to state that neither the examiner's report nor the Commission's order particularized the reasons for their conclusion that a refund should be required to Delmarva's retail customers. There was, however, evidence in the record from which the Commission could conclude that Delmarva's failure to factor nuclear test generation into the calculation of fuel rate adjustment charges resulted in the collection of greater revenues than Delmarva was entitled to receive.

All the parties to this case agree that retroactive rate making is impermissible, but we think the controversy in this case is to be distinguished from the Commission's function in approving rates to be charged in a base rate hearing proceeding.

As we have indicated, the theory of permitting the filing of FRA clauses with the Public Service Commission is to permit a more rapid recognition and recovery of fluctuating fuel costs without the requirement of lengthy and complex hearings. As these FRA clauses contemplate complex formulas which must be tested against mathematical calculations from designated figures each month, we conclude that implicitly, the Commission must retain

jurisdiction over such charges in order to assure that the charges made are fair and reasonable to the customer as well as to the company. Where, as in this case, the Commission determines that an overrecovery has been made by the company, the Commission under the broad powers granted it by Section 1, and Section 56 of Article 78 may in its discretion order a refund of the overrecovery in order to enforce the plain meaning of Section 27 (a) (2) which prohibits a public utility company from demanding or collecting a "greater or less compensation for any service or commodity than specified therefor in its schedules in force at the time." If, as determined by the Commission, Delmarva did miscalculate its fuel rate and as a result of the miscalculation did receive $400,000 in excess charges, then to suggest that the Commission had no power to order a refund as to these particular charges would make Section 27 (a) (2) completely unenforceable and nugatory. We do not mean by this conclusion to suggest even remotely that the Commission is empowered to engage in retroactive rate making, but we distinguish between the ordinary rate making process and the necessarily ongoing process of verifying and adjusting fuel rate adjustment clauses so that they accurately reflect the increased and decreased costs (we hope) of the fuel necessary to operate a utility plant.

We believe that upon a consideration of the entire record before the Commission a reasoning mind could have reached the factual conclusion the Commission reached, *i.e.,* that Delmarva should have included its nuclear test generation in calculating its total net generation, and that having reached that conclusion the Commission had the express and inherent power under Section 27 (a) (2), Section 1, and Section 56 of Article 78 to order a refund of moneys the Commission found overrecovered by Delmarva.

> *Judgment reversed, remanded to Circuit Court for Dorchester County with instructions to enter judgment affirming order of Public Service Commission; costs to be paid by appellee.*