WISCONSIN POWER & LIGHT COMPANY, Petitioner-Respondent,

WISCONSIN PUBLIC SERVICE CORPORATION, Intervenor-Respondent,

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN, Respondent-Appellant-Petitioner,

VULCAN MATERIALS COMPANY, General Motors Corporation, Enzyme Bio-Systems, 3M Company, Georgia-Pacific Corporation and Penda Corporation (Collectively the Wisconsin Industrial Energy Group and WIEG), Intervenors-Appellants-Petitioners.

Supreme Court

*No. 91–1096. Oral argument September 7, 1993.—Decided February 8, 1994.*

(Also reported in 511 N.W.2d 291.)

385

For respondent-appellant-petitioner there were briefs by *Steven Levine,* staff counsel, and *Steven M. Schur,* chief counsel, Madison and oral argument by *Steven M. Schur.*

For the intervenors-appellants-petitioners there were briefs by *Michael G. Stuart, Anita T. Gallucci* and *Boardman, Suhr, Curry & Field,* Madison and oral argument by *Michael G. Stuart.*

For the petitioner-respondent there was a brief by *William D. Harvey,* staff counsel, and *Barbara J. Swan,* staff counsel, Madison and oral argument by *William D. Harvey.*

For the intervenor-respondent there was a brief by *Allen W. Williams, Jr., Bradley D. Jackson* and *Foley & Lardner,* Madison and oral argument by *Allen W. Williams, Jr.*

STEINMETZ, J. The issue presented in this case is: Does the Public Service Commission of Wisconsin (PSC or commission) have the authority to order a utility to pay a lump sum penalty based on the utility's past imprudent management?

In 1989, the PSC determined that Wisconsin Power and Light Company (WPL or utility) had imprudently administered a coal contract. The commission found that as a result of this alleged imprudence, WPL overcharged its customers for electricity from 1974 until 1989. Accordingly, the PSC ordered WPL to pay $9 million in penalties.

The Dane county circuit court, the Honorable Robert A. De Chambeau, reversed the PSC's order, holding that the penalty constitutes impermissible retroactive ratemaking. The court of appeals affirmed the trial court's order. *Wis. Power & Light v. Public Service Comm.,* 171 Wis. 2d 553, 572, 492 N.W.2d 159 (Ct. App. 1992).

WPL, Madison Gas and Electric (MGE) and Wisconsin Public Service Corporation (WPSC) jointly own

the Columbia generating station near Portage, Wisconsin. WPL operates the facility. In 1972, WPL entered into a 20-plus-year contract to purchase coal for the Columbia station from Western Energy Coal Company (WECO). Under the terms of the contract, WECO would adjust the cost of the coal to reflect changes in various price indices and WECO's actual cost of mining. Between October, 1974, when WECO began delivering coal to the Columbia station, and December, 1987, the price WECO charged WPL for coal rose from $2.05 per ton to $10.40 per ton—an average increase of 13.3 percent each year.

As WPL's coal costs increased, so did the rate WPL charged its customers for electricity. WPL set its rates using two different procedures during the period of time in question. From 1974 until October, 1984, the utility based future rates on automatic fuel adjustment clauses (FACs). A FAC is a rate formula, approved by the PSC, that enables a utility to pass on increases in fuel costs directly to the utility's customers without going through the otherwise mandatory administrative review. Accordingly, while FACs were in place, WPL's customers bore the burden of WECO's higher coal prices.

Beginning in October, 1984, pursuant to the passage of sec. 196.20(4)(b), Stats., the legislature prohibited electric utility companies from setting rates based on FACs. From that time on, the PSC fully scrutinized each projected increase in WPL's rates under standard administrative procedures involving audits and test year estimates. Under these two very distinct rate setting methods—with and without FACs—the PSC did approve 14 WPL rate orders in the 15-year period at issue.

In 1985, one of the commission's newly hired fuel auditors suggested to WPL that the utility was paying an unreasonably high price for coal under the WECO contract. Following both an internal audit and an audit conducted by an outside accounting firm, WPL concluded that WECO had overcharged WPL for coal between 1974 and 1987. WPL and WECO subsequently entered into negotiations concerning their contract. As a result of these negotiations, WECO reduced the price of coal from $10.40 per ton to $8.70 per ton and WPL agreed to continue to purchase coal from WECO for an additional ten years. WECO did not, however, refund any money to WPL to cover the overcharges. In addition, WPL waived its right to recover any of the overcharges.

WPL filed an application with the PSC on December 30, 1988, to increase its retail electric rate. Pursuant to this application, the commission conducted an audit of WPL's books, accounts, practices and activities and discovered that WECO had grossly overcharged WPL for coal and that WECO had never refunded any money to WPL. Following extensive hearings, the PSC concluded that WPL had acted imprudently in administering the WECO contract by: 1) failing to notice the overcharges sooner; 2) neglecting to inform the other owners of the Columbia generating station about the overcharges; and 3) waiving any claim to the past overcharges when renegotiating the WECO contract. The commission ordered WPL to pay a penalty of $9 million, substantially less than the estimated $13 million to $52 million in actual overcharges. However, the PSC's findings of fact make it clear that the commission derived the amount of the penalty directly from the actual overcharges. The order requires WPL to pay a portion

of the penalty in the form of credits to its customers and the remainder as lump sum payments to MGE and WPSC to pass on to their customers.

On November 22, 1989, WPL petitioned the Dane county circuit court for judicial review of the PSC's order pursuant to ch. 227, Stats. In particular, WPL asked the court to decide whether the PSC has the authority to assess the $9 million penalty against the utility and whether the commission's finding that WPL acted imprudently was correct. The trial court reversed the PSC's order, finding that the penalty constitutes impermissible retroactive ratemaking, in violation of sec. 196.37(1), Stats.[1] Because this decision disposed of the entire matter, the court did not reach the issue of WPL's alleged imprudence. Before the trial court, WPSC intervened on behalf of WPL. Six corporations, collectively referring to themselves as the Wisconsin Industrial Energy Group (WIEG), intervened on behalf of the PSC.

The PSC and WIEG appealed from the trial court's order. The court of appeals affirmed this order, agreeing with the trial court that the commission violated the rule against retroactive ratemaking. *Wis. Power & Light,* 171 Wis. 2d at 572.

WIEG offered an alternative argument to both courts. WIEG contended that while FACs were in place, due to WPL's imprudence, the utility had charged a rate above the rate filed with the PSC. This

---

[1] Section 196.37(1), Stats., provides as follows:

**Lawful rates; reasonable service. (1)** If, after an investigation under this chapter and ch. 197, the commission finds rates, tolls, charges, schedules or joint rates to be unjust, unreasonable, insufficient or unjustly discriminatory or preferential or otherwise unreasonable or unlawful, the commission shall determine and order reasonable rates, tolls, charges, schedules or joint rates to be imposed, observed and followed in the future.

violated the filed rate doctrine, codified in sec. 196.22, Stats.[2] According to WIEG, when a utility violates the filed rate doctrine, the PSC has the power to order the utility to refund excess revenue. Hence, the order does not constitute retroactive ratemaking, but rather a valid exercise of the PSC's authority. Both lower courts rejected this argument. This court accepted the petition for review filed by the PSC and WIEG.

This review presents a question concerning the statutory authority of the PSC to order a utility to refund validly collected revenue. The extent of an agency's statutory authority is a question of law. Thus, courts owe no deference to an agency's determination concerning its own statutory authority. *Wis. Environmental Decade v. Public Service Comm.,* 81 Wis. 2d 344, 351, 260 N.W.2d 712 (1978); *GTE North, Inc. v. Public Service Comm.,* 176 Wis. 2d 559, 564, 500 N.W.2d 284 (1993).

As a creation of the legislature, the PSC "has only those powers which are expressly conferred or which are necessarily implied by the statutes under which it operates." *Kimberly Clark Corp. v. Public Service Comm.,* 110 Wis. 2d 455, 461–62, 329 N.W.2d 143 (1983). No provision in ch. 196, Stats., expressly authorizes the commission to order a utility to refund money to its customers when the utility may have acted imprudently. In fact, sec. 196.37(1) only allows the PSC

---

[2] Section 196.22, Stats., provides as follows:

**Discrimination forbidden.** No public utility may charge, demand, collect or receive more or less compensation for any service performed by it within the state, or for any service in connection therewith, than is specified in the schedules for the service filed under s. 196.19, including schedules of joint rates, as may at the time be in force, or demand, collect or receive any rate, toll or charge not specified in the schedule.

to "determine and make any just and reasonable rates, tolls, charges, schedules or joint rates to be imposed, observed and followed *in the future.*" (Emphasis added.) This court has acknowledged that this rule against retroactive ratemaking is firmly ensconced in Wisconsin law. *See Kimberly-Clark Corp.,* 110 Wis. 2d at 468 "we conclude that there is no express or implied grant of authority . . . empowering the PSC to set retroactive rates and order refunds"; *Friends of Earth v. Public Service Commission,* 78 Wis. 2d 388, 412, 254 N.W.2d 299 (1977) "[t]o permit the PSC to condition a rate order on refund of sums collected under previously established permanent rates would directly violate the rule against retroactive ratemaking".

The PSC admits that the order at issue here constitutes retroactive ratemaking. However, the PSC argues that the order is permissible as a recognized exception to the general prohibition against such actions.

Under certain very narrow circumstances, Wisconsin courts have affirmed PSC orders allowing a utility to set future rates high enough to recoup past losses. In *Wis. Environmental Decade v. Public Service Comm.,* 98 Wis. 2d 682, 698, 298 N.W.2d 205 (Ct. App. 1980), the commission ordered a rate increase for the Wisconsin Electric Power Company, in part to allow recovery of extraordinary losses caused by a severe ice storm. The court of appeals affirmed the order, stating: "We cannot conclude, however, that the prohibition against retroactive ratemaking applies in the recouping of an extraordinary casualty loss." *Id.* at 699. The PSC's order, in this case, certainly does not fall within this narrow "extraordinary loss" exception to the rule against retroactive ratemaking.

393

The PSC next suggests that its order falls within a well-established "management imprudence" exception to the rule against retroactive ratemaking, recently recognized by the court of appeals in *Public Serv. Corp. v. Public Serv. Comm.*, 156 Wis. 2d 611, 457 N.W.2d 502 (Ct. App. 1990). In that case, the commission found that WPSC had acted imprudently by not protesting its tax payments when it had reason to believe part of the tax code was unconstitutional. As a result of this imprudence, WPSC was not eligible to receive a large tax refund when other utilities were successful in challenging the tax law. The PSC set WPSC's rate of return for the year at 12.9 percent—.1 percent below the calculated optimal rate. The PSC now claims that its order in this case, requiring WPL to refund $9 million, is no different than the minor rate adjustment allowed in *Public Serv. Corp. v. Public Serv. Comm.*, 156 Wis. 2d at 620.

Contrary to the PSC's belief, the court of appeals did not rely on any "management imprudence" exception in affirming the PSC rate order in *Public Serv. Corp. v. Public Serv. Comm.* Rather, the court determined that the final rate set by the commission was "within a range of reasonableness." The commission merely used WPSC's past imprudence as one factor in setting *future rates;* and, because the final rate was reasonable, the court of appeals upheld the PSC's rate order. *Id.* at 619–20.

This procedure has always been available to the PSC. As the dissenting opinion points out, "[l]ooking forward and looking backward in setting rates are not so easily divorced from one another." In this case, the commission could have taken the extraordinarily high cost for coal that WPL passed along to consumers the previous year into account in setting future rates. The

PSC did not, however, do this. Rather, 15 years later, the PSC decided that it should order WPL to pay a penalty. This the PSC does not have the authority to do.[3]

Assuming we have not done so in the past, the PSC now asks this court to recognize this "management imprudence" exception to the rule against retroactive ratemaking. This exception would allow the commission to require public utilities to refund past imprudently incurred costs.

██

We refuse to recognize such an exception. Nothing in ch. 196, Stats., suggests or implies that the PSC has the authority to order refunds or penalties for past management imprudence. The statute is plain on its face. The commission may only set rates prospectively, without recourse to backward-looking remedies like the WPL penalty ordered in this case.

The commission argues that it should be able to review a utility's past actions at any time. If the commission finds that the utility's conduct was imprudent, the commission proposes that it should have the authority to order the utility to refund any imprudently incurred costs, even though the costs were collected pursuant to the utility's PSC-approved rates. We reject this proposal. The PSC's proposed "management imprudence" exception would "swallow" the rule against retroactive ratemaking. If the PSC had this authority, no utility earnings would be safe from PSC

---

[3] None of the parties have argued that the doctrine of laches should apply here to bar the PSC from making this order. While the doctrine of laches could very well prohibit the commission's actions, this court will not address that argument because the prohibition against retroactive ratemaking does apply in this case to produce the same result.

ordered refunds and no utility rate order would ever become final.

WIEG argues that different analyses apply to the different methods of setting rates. For that portion of the PSC-ordered refund corresponding to WPL's revenues after FACs were discontinued, WIEG acknowledges that the rate order at issue constitutes retroactive ratemaking and joins the PSC in asking this court to recognize a "management imprudence" exception to the prohibition of this practice.

However, for that portion of the refund corresponding to WPL's revenues when FACs were in place, WIEG offers an alternative explanation of why the PSC order is valid. According to WIEG, this portion of the penalty is not retroactive ratemaking. Rather, WIEG argues that while FACs were in place, WPL violated the filed rate doctrine. The PSC has the authority to order WPL to disgorge any excess revenue resulting from WPL charging its customers more than the filed rate.

█ Under the filed rate doctrine, codified in sec. 196.22, Stats., a utility must charge the rate that it files with the commission and that the commission approves. If a utility charges its customers a higher rate, the PSC may order the utility to refund its excess revenue. *See GTE North,* 176 Wis. 2d at 570. WIEG claims that WPL, due to its imprudent management of the WECO contract, actually charged its customers higher rates than those approved by the commission during the period when FACs were in place. According to WIEG, the PSC did not have the authority and thus, could not review the actual rates charged during this period. The PSC could only review the FAC formula. Therefore, while FACs were in place, the FAC formula,

by itself, was the filed rate. WIEG argues that WPL's imprudent management of the WECO contract caused WPL to use unreasonably high fuel costs when calculating the rates using FACs. In so doing, WPL, in effect, charged rates above the filed rates. Hence, according to WIEG, because WPL violated the filed rate doctrine, the commission had the authority to order the refund at issue.

WIEG relies primarily on two cases from other jurisdictions to support this argument. *See Public Serv. Comm. of New Hampshire,* 6 FERC par. 61,299 (1979); *Niagara Mohawk Power v. PSC of New York,* 507 N.E.2d 287 (N.Y. 1987). In each of these cases, a utility's imprudence resulted in unreasonably high fuel costs being used in calculating energy rates based on FACs. A regulatory agency then ordered the utility to refund the excess revenue collected as a result of using these imprudently incurred costs. In *Niagara Mohawk Power,* 507 N.E.2d at 291, the regulatory commission only had the authority to review the utility's rates retrospectively. *Niagara Mohawk Power,* 507 N.E.2d at 291. *Public Serv. Comm. of New Hampshire* is an opinion and order of the Federal Energy Regulatory Commission (FERC). This decision was never reviewed by a court. Furthermore, the opinion does not discuss the issue that this court has determined to be dispositive in this case—the amount of oversight and review the regulatory agency could have and actually did conduct. It appears that FERC did not review rate orders based on FACs, but rather relied on private complaints for oversight. *Public Serv. Comm. of New Hampshire,* 6 FERC at 61,711.

In Wisconsin, the PSC had the statutory authority to oversee WPL's contract with WECO during the entire period of time in question. *See* sec. 196.02(5),

Stats.[4] The court of appeals recognized that the PSC had this authority in *Wisconsin Environmental Decade, Inc. v. Public Serv. Comm.,* 105 Wis. 2d 457, 459, n.1, 313 N.W.2d 865 (Ct. App. 1981), where it stated:

> Although adjustment clauses operate automatically to raise or lower a retail customer's electric bills according to the application of a mathematical formula contained in the clause, before determining whatever increased fuel costs may be passed through, the PSC may, on its own motion, conduct a summary investigation and may order formal hearings into the matter.

WIEG is, thus, incorrect in its assertion that while FACs were in place, the PSC could only review the formula and nothing else that went into the rate determination.

The dissenting opinion claims that based on the court's holding today, either the PSC could have imposed a retroactive penalty or refund—in which case this opinion is "internally inconsistent"—or the PSC was powerless to remedy any problems while FAC's were in place. The dissent fails to apply the procedure outlined by the court of appeals in the language quoted above from *Wisconsin Environmental Decade. Id.*

---

[4] Section 196.02(5), stats., provides as follows:

**(5)** INSPECT BOOKS. The commission or any commissioner or any person employed by the commission for that purpose may, upon demand, inspect the books, accounts, papers, records and memoranda of any public utility, and examine under oath any officer, agent or employee of the public utility in relation to its business and affairs. Any person, other than one of the commissioners, who makes a demand shall produce his or her authority to make the inspection.

This section of the statutes did not change in substance between 1974 and 1989.

Before approving each and every rate order between 1974 and 1984—while FACs were in place—the PSC could have conducted a summary investigation and ordered formal hearings to examine the reasonableness of the fuel costs being passed on to consumers. If the PSC had taken the time to do this, it would likely have found that WECO was drastically overcharging WPL. The commission could then have suggested to WPL that it reevaluate its contract with WECO. This same procedure resulted in WECO reducing coal prices in 1987. Unfortunately, the PSC failed to act in time.

In addition, when the commission approved WPL's rates in 1980, the commission imposed enhanced reporting requirements on WPL to insure the accuracy of the utility's collections under the FAC. *Wisconsin Power & Light Co.,* 64 Wis. PSC Reports 57, 74 (1980). The commission stated that it "would be remiss in authorizing this fuel adjustment clause without making provision for adequate and necessary controls over the elements of costs determining the increment of price change ultimately passed on to consumers." *Id.*

The record is unclear as to how carefully the commission actually did review each rate order prior to 1984. This, however, is irrelevant because, as noted above, the PSC had the power to review WPL's records. In 14 previous rate orders—some while FACs were in place and others subject to standard administrative review—the PSC never questioned the price WPL paid for coal. Former commissions that issued these orders did their jobs and discharged their statutory duty to set just and reasonable rates for the future. At no time did consumers pay more than the rate approved by the PSC. Thus, WPL did not violate the filed rate doctrine.

The PSC not only had the power and responsibility to audit WPL's fuel costs and rates in general, but also represented that it regularly did perform such audits. When the commission had concerns about a utility's use of a FAC, it would approve the utility's rates on an interim basis, with the explicit condition that the utility would refund fuel costs to the consumers if those costs were later found to be unreasonable. *E.g., Wisconsin Electric Power Co.,* 64 Wis. PSC Reports 199, 205 (1980). This court approved that practice in *Friends of Earth,* 78 Wis. 2d at 412–13. However, in that case, this court made it clear that the PSC could not order the refund of revenue collected under unconditional rates. The rate orders in question here were unconditional. Hence, the commission is now attempting to do precisely what we found to be illegal in *Friends of Earth.*

This commission appears to be frustrated by the bounds of its authority. It is precluded by statute from correcting what it now considers to be errors made by the commission between 1974 and 1989. The current PSC believes that 14 previous rate orders, allowing WPL to recover the cost of coal under the WECO contract, were wrong. However, during that entire period, the PSC had at its disposal the mechanisms and authority to review WPL's coal costs. The commission did review WPL's costs and did audit the utility's practices and performance from 1974 to 1989 and regularly approved WPL's rates as just and reasonable.

■ In this case, WPL indisputably collected no more from consumers for its coal costs than it paid to vendors. This is exactly what the PSC approved when it issued each of the rate orders in question. The commission has now ordered WPL to refund part of these fuel costs because it believes WPL acted imprudently in

managing its coal contract with WECO. Having approved WPL's rates, including the utility's expected coal costs, 14 times, the PSC cannot now claim that WPL must return this money. We hold that the PSC's order constitutes impermissible retroactive ratemaking. Therefore, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

JUSTICE JON P. WILCOX, took no part.

SHIRLEY S. ABRAHAMSON, J. (*dissenting*). The majority today reverses the Public Service Commission's (PSC's) order on the ground that it violates the rule against retroactive ratemaking. The test of the soundness of the majority's decision is the extent to which it serves the purposes underlying utility regulation and the rule against retroactive ratemaking. I conclude that it fails this test. Accordingly, I dissent.

The state regulates public utilities to achieve the benefits of economies of scale and to protect consumers from monopoly control of a public good.[1] Indeed, "the primary purpose of the public utility laws in this state is the protection of the consuming public." *Wis. Environmental Decade v. Public Service Comm.,* 81 Wis. 2d 344, 351, 260 N.W.2d 712 (1978) (citing *Wisconsin Power & Light Co. v. Public Service Commn,* 45 Wis. 2d 253, 259, 172 N.W.2d 639 (1969). *See also GTE North Inc. v. Public Service Commn,* 176 Wis. 2d 559, 568, 500 N.W.2d 284 (1993); *Calumet Service Co. v. Chilton,* 148 Wis. 334, 358–359, 135 N.W. 131 (1912).

---

[1] Charles F. Phillips, Jr., *The Regulation of Public Utilities* 45–47 (1988); A.J.G. Priest, *Principles of Public Utility Regulation* 1–3 (1969).

The rule against retroactive ratemaking is designed to achieve the same goals. The rule rewards the utility's efficiency and protects the consumer from surprise surcharges allocable to the utility's losses in prior years. Further, the rule ensures fairness, stability and certainty by preventing a regulatory agency from reversing prior approved rates. *Wisconsin Environmental Decade v. Public Service Commn,* 98 Wis. 2d 682, 699, 298 N.W.2d 205 (1980); *Narragansett Electric Co. v. Burke,* 415 A.2d 177, 178 (R.I. 1980). "Were it not so, a premium would be placed upon inefficiency, waste and negligence in management. It is better policy to encourage thriftiness, saving and frugality on the part of a utility management. Such incentive inures eventually to the benefit of the consumers." *Indiana Gas v. Utility Consumer Counselor,* 575 N.E.2d 1044, 1052 (Ind. App. 1991) (citation omitted).

If the rule against retroactive ratemaking is to remain a useful principle of regulatory law, it must be understood and applied in a manner that does not undermine its purpose. *Southern California Edison Co. v. Public Utilities Commission,* 576 P.2d 945 (Calif. 1978). The traditional rule against retroactive ratemaking is riddled with exceptions and contradictory applications.[2] Instead of exploring the premises of

---

[2] *See* Stefan H. Krieger, *The Ghost of Regulation Past: Current Applications of the Rule Against Retroactive Ratemaking,* 1991 U. Ill. L. Rev. 983.

For exceptions in Wisconsin, *see, e.g., GTE North Inc. v. Public Service Commn,* 176 Wis. 2d 559, 500 N.W.2D 284 (1993) (PSC has authority to order refund when filed tariffs violated); *Wis. Environmental Decade v. PSC,* 98 Wis. 2d 682, 698–99, 298 N.W.2d 205, 211–12 (Ct. App. 1980) (utility may recoup extraordinary loss from severe ice storm through future rates); *Friends of the Earth v. Public Service Commission,* 78 Wis. 2d

the rule and its applicability to this fact situation, the court mechanically applies the rule against retroactive ratemaking in this case.[3]

The majority's homage to the rule against retroactive ratemaking in this case is flawed. First, to state the obvious, the majority presupposes that the PSC was engaged in traditional ratemaking within the meaning of the rule against retroactive ratemaking during the automatic fuel adjustment clause period (1974–84). Fuel adjustment clauses are, however, "unique animals that are not easily assimilated to classical ratemaking principles." *Maine Public Service Co. v. Federal Power Commission,* 579 F.2d 659, 668 (1st Cir. 1978); *Daily Advertiser v. Trans-LA,* 612 So.2d 7, 24 (La. 1993); *Niagara Mohawk Power v. P.S.C. of New York,* 507 N.E.2d 287, 293 (N.Y. 1987); *Richter v. Florida Power Corp.,* 366 So.2d 798, 800 (Fla. App. 1979).

Second, the majority's very reliance on the PSC's power to oversee the fuel contract during the fuel adjustment clause period, and to audit the fuel costs, implies that the PSC could have assessed some penalty or refund against WP&L after the PSC discovered WP&L's improper administration of the fuel contract. The PSC would have learned of WP&L's errors in administering the coal contract only after they occurred. Thus the majority seems to concede either

---

388, 254 N.W.2d 299 (1977) (rates charged during a lengthy rate setting process could be revised and overcharges refunded in the future).

[3] The majority accepts at face value the PSC's admission that it was engaged in retroactive ratemaking when it ordered the $9 million payment. The PSC made this point as part of its argument for the creation of a "management imprudence" exception to the rule against retroactive ratemaking.

that the PSC could have imposed a retroactive penalty or refund on account of improper administration of the fuel adjustment clause (and thus the opinion is internally inconsistent) or that the PSC was powerless to remedy problems identified through audits of fuel costs (in which case audits are worthless for purposes of ensuring a utility's compliance with the fuel adjustment clause). *See, e.g., Daily Advertiser v. Trans LA,* 612 So.2d 7, 25 (La. 1993).[4]

An automatic fuel adjustment clause was a PSC-approved formula rate. It assured the utility that it would recover fuel costs dollar for dollar from its customers without going through the audit and test year process that other expenses receive and without complying with otherwise applicable notice and hearing requirements when its fuel costs changed. *Wisconsin Environmental Decade v. Public Service Commn,* 81 Wis. 2d 344, 346, n.1, 260 N.W.2d 712 (1978). In other words, the operation of the PSC-approved formula rate made it possible for the utility to pass on all fuel price adjustments to its ratepayers automatically. The practical effect of adjustment clauses was to decrease the volume of rate hearings, thereby conserving the time of the PSC and simultaneously reducing public scrutiny

---

[4] This reasoning is similar in many respects to the argument presented by the Wisconsin Industrial Energy Group (WIEG), which intervened on the PSC's side. The WIEG labelled its version of the argument the "filed rate doctrine." See Brief of the Intervenors-Appellants-Petitioners at 12–29. For support of this position, see *GTE North Inc. v. Public Service Commn,* 176 Wis. 2d 559, 500 N.W.2D 284 (1993) (PSC has authority to order refund when filed tariffs violated).

I do not believe it necessary to resort to another doctrine to demonstrate the weaknesses in the majority's logic.

of rate changes. *Id.* at 349.[5] This combination of factors had unfortunate results. As the majority notes, the PSC found that between 1974 and 1987 WP&L had overcharged its customers $13 million to $52 million because of errors in the administration of its coal contract with Western Energy Coal Company (WECO).

Many courts around the country have concluded that the use of automatic fuel adjustment clauses does not constitute ratemaking in the traditional or classical sense of that term. Fuel adjustment clauses are a means of arriving at a rate. While they are thus an integral part of the rates, they are not "commission-established" rates. Because rates calculated under the fuel adjustment clause go into effect without advance approval by the PSC, the utility cannot validly expect that charges thus collected are insulated from retroactive modification. Courts have therefore concluded that a regulator agency's authorizing the use of fuel adjustment clauses is not engaging in ratemaking subject to the rule against retroactive ratemaking. *Equitable Gas Co. v. Pennsylvania Public Utility Commission,* 526 A.2d 823, 830–31 (Pa. Cmwlth. 1987), appeal denied, 533 A.2d 714 (Pa. 1987); *Metropolitan Edison Co. v.*

[5] This court has apparently never ruled on the validity of fuel adjustment clauses. *Wisconsin Environmental Decade v. PSC,* 81 Wis. 2d 344, 352, n.4, 260 N.W.2d 712 (1978).

The automatic adjustment clause was eliminated by the legislature as part of 1983 Wis. Act 27, the budget bill. The law now requires a formal rate hearing process. Section 196.20(4), Stats. 1991–92.

When the fuel adjustment clause was eliminated by the legislature in 1984, the PSC was granted two fuel auditor positions and had to devise mechanisms for oversight of fuel costs. This case arises because of WP&L's first complete audit in its 1985 rate case.

405

*Pennsylvania Public Utility Commission,* 437 A.2d 76, 79–80 (Pa. Cmwlth. 1981); *Southern California Edison Co. v. Public Utilities Commission,* 576 P.2d 945, 954–55 (Calif. 1978).

Courts in other states have also concluded that a regulatory agency's authority to investigate fuel cost adjustments implies the power to order corrective measures and refunds as a result of such audits. According to these courts, if the PSC is to be effective, its ongoing authority to investigate fuel costs must include the power to take corrective measures and order refunds for charges not properly incurred. "[T]he power to order refunds must be implied for there is little purpose in reviewing fuel adjustment charges, and the consumer interests are ignored, if corrective action is not authorized for imprudent expenditures automatically passed through to the ratepayers." *Niagara Mohawk Power v. P.S.C. of New York,* 507 N.E.2d 287, 293 (N.Y. 1987). See also *Public Service Commission v. Delmarva Power & Light Co.,* 400 A.2d 1147, 1153 (Md. 1979);[6] *Gulf Power Co. v. Florida Public Service Commn,* 487 So.2d 1036 (Fla. 1986); *Daily Advertiser v. Trans-LA,* 612

_____

[6] "As these FRA clauses contemplate complex formulas which must be tested against mathematical calculations from designated figures each month, we conclude that implicitly, the Commission must retain jurisdiction over such charges in order to assure that the charges made are fair and reasonable to the customer as well as to the company . . .. We do not mean by this conclusion to suggest even remotely that the Commission is empowered to engage in retroactive rate making, but we distinguish between the ordinary rate making process and the necessarily ongoing process of verifying and adjusting fuel rate adjustment clauses so that they accurately reflect the increased and decreased costs (we hope) of the fuel necessary to operate a utility plant." *Public Service Commission v. Delmarva Power and Light Co.,* 400 A.2d 1147, 1153 (Md. 1979).

So.2d 7, 23 (La. 1993); *MGTC, Inc. v. Public Service Commission of Wyoming,* 735 P.2d 103, 107 (Wyo. 1987); *Ohio Power Co. v. Public Utility Commission,* 376 N.E.2d 1337, 1339 (Ohio, 1978).[7]

The fuel adjustment clause in operation in Wisconsin during the period in question is not readily distinguishable from those at issue in these states. Had the majority examined the operation of the fuel adjustment clause more closely, it might well have concluded that it does not constitute ratemaking in the traditional sense and that the rule against retroactive ratemaking does not apply to refunds ordered because of the fuel adjustment clause.

The majority's holding relies not only on the questionable assumption that the PSC was engaging in ratemaking when it approved the fuel adjustment clause formulas, but also on the proposition that the PSC is empowered only to look forward, never backward. Looking forward and looking backward in setting rates are not so easily divorced from one another. It is well accepted that recent history is part of the ratesetting process. As WP&L and the majority concede, the past mistakes of management may be used by the PSC as a factor in setting rates for the coming year. *See, e.g., Wisconsin Environmental Decade v. Public Service Commission,* 98 Wis. 2d 682, 699, 298 N.W.2d 205 (Ct. App. 1980). The difficulty with that method, however, is that it enables the PSC to

---

[7] See also *Indiana Gas Co. v. Office of the Utility Consumer Counselor,* 575 N.E.2d 1044, 1052–53 (Ind. App. 1991) (rule against retroactive ratemaking does not apply to fuel adjustment clauses because the policy of management efficiency is not served).

407

remedy only the utility's small mistakes, not its big ones.[8]

A rate determined according to a fuel adjustment clause cannot be declared reasonable until after it has been implemented. Thus a regulatory agency can identify overcharges only through a retrospective analysis. *Business and Professional People for the Public Interest v. Illinois Commerce Commission,* 525 N.E.2d 1053, 1958 (Ill. App. 1988), appeal denied, 530 N.E.2d 237 (1988). Any attempt to recoup unreasonable charges must also involve a retrospective inquiry.

The majority's mechanical application of the rule against retroactive ratemaking to the facts of this case does not, in my opinion, stand up to critical examination. Perhaps more important, however, it defeats the

---

[8] WP&L suggests that if there is imprudence, the PSC is empowered, at most, to set its future rates at the lower end of what might be considered "reasonable." *Public Service Corp. v. Public Service Commission,* 156 Wis. 2d 611, 620, 457 N.W.2d 502 (Ct. App. 1990). Under the reasoning of WP&L (Brief at 8–9) and intervenor Wisconsin Public Service Corporation (Brief at 15–17), which intervened on the side of WP&L, the PSC might have been able to deduct a tenth of a percentage point from WP&L's rate for the coming year, but not the two full percentage points that would have been equivalent to the $9 million penalty the PSC imposed. A two percentage point reduction would have rendered a return too low to be considered reasonable. Thus, the utilities' argument goes, the PSC is empowered to consider a utility's past conduct in setting rates for the coming year, but not very much. If a utility makes a small mistake, then consumers may be reimbursed through reductions in future rates; if a utility makes a big mistake, however, consumers have virtually no consolation. The PSC resolved this paradox by ordering WP&L to refund $9 million to its customers and co-owners as a lump sum amortized over a two year period.

very purposes of the rule. It does not encourage efficient utility management. The interests of consumers, the intended beneficiaries of the rule, are not served by the court today.

For the reasons set forth, I dissent.

I am authorized to state that CHIEF JUSTICE NATHAN S. HEFFERNAN joins this dissent.