William J. FABER, D.O., Petitioner-Respondent-Petitioner,

v.

Josephine W. MUSSER, Commissioner of Insurance and Board of Governors, Wisconsin Health Care Liability Insurance Plan, Respondents-Appellants.

Supreme Court

*No. 95–0968. Submitted on briefs November 14, 1996.—Decided January 24, 1997.*

(Also reported in 557 N.W.2d 808.)

For the petitioner-respondent-petitioner there were briefs by *Robert J. Kay* and *Kay & Andersen, S.C.*, Madison.

For the respondents-appellants there was a brief by *Susan K. Ullman*, assistant attorney general, with whom on the brief was *James E. Doyle*, attorney general.

¶ 1. ANN WALSH BRADLEY, J. The petitioner, William J. Faber, D.O., seeks review of an unpublished decision of the court of appeals, which upheld a determination of the respondent, Board of Governors of the Wisconsin Health Care Liability Insurance Plan (WHCLIP), that it was not obligated to

furnish insurance coverage to Faber.[1] The petitioner asserts that WHCLIP is statutorily required to provide liability insurance to health care professionals who lose coverage as a result of insurer liquidation. Because we conclude that the petitioner's sole recourse for loss of liability insurance caused by insurer liquidation is through the Wisconsin Insurance Security Fund (WISF), we affirm the decision of the court of appeals.

¶ 2.   An examination of the scope of coverage provided under our State's system of statutory back-up medical malpractice liability insurance is helpful to an understanding of the facts of this case. We begin with a review of that system.

¶ 3.   Generally, all Wisconsin health care providers are required to maintain minimum levels of health care liability insurance through policies issued by insurers licensed to do business in this State. Wis. Stat. § 655.23(3) (1993–94).[2] For the time period relevant in

---

[1] *Faber v. Musser*, No. 95–0968, unpublished op. (Wis. Ct. App. Sept. 28, 1995) (reversing a decision of the Circuit Court for Dane County, Paul J. Higginbotham, Judge).

[2] Unless otherwise indicated, all future statutory references are to the 1993–94 volume. Wisconsin Stat. § 655.23(3) provides in relevant part as follows:

> (3) (a)   Except as provided in par. (d), every health care provider either shall insure and keep insured the health care provider's liability by a policy of health care liability insurance issued by an insurer authorized to do business in this state or shall qualify as a self-insurer. Qualification as a self-insurer is subject to conditions established by the commissioner and is valid only when approved by the commissioner.
>
> . . . .
> (d)   If a cash or surety bond furnished by a health care provider for the purpose of insuring and keeping insured the health care provider's liability was approved by the commissioner before April 25, 1990, par. (a) does not apply to the health care provider while the cash or surety bond remains in effect.

this case, a health care provider must maintain liability coverage in an amount not less than "$400,000 for each occurrence and $1,000,000 for all occurrences in any one policy year. . . ." § 655.23(4). A provider's potential liability exposure is limited to the amounts expressed in § 655.23(4), or the amount of coverage actually maintained by the provider, whichever is greater. § 655.23(5).

¶ 4. WHCLIP provides health care liability insurance "for risks in this state which are equitably entitled to but otherwise unable to obtain such coverage. . . ." Wis. Adm. Code § 17.25(1)(a); Wis. Stat. § 619.04. It was created as part of a legislative response to the medical malpractice crisis of the 1970's, which had resulted in a decrease in the number of commercial insurers, and an increase in restrictions on coverage. In essence, WHCLIP is an " 'involuntary' association[ ] of commercial insurers who are required by the state to share the risks of health care providers which are unable to obtain commercial insurance from the usual [commercial] sources." Rowland H. Long, *The Law of Liability Insurance* § 12.01(2) (MB 1996). Generally, the maximum coverage available under a WHCLIP policy is $400,000 for each occurrence and $1,000,000 for all occurrences in a given year.[3] Wis. Adm. Code § Ins 17.25(3)(d)(3).

¶ 5. WISF was created to "maintain public confidence in the promises of insurers by providing a mechanism for protecting insureds from excessive delay and loss in the event of liquidation of insurers and by assessing the cost of such protection among insurers. . . ." Wis. Stat. § 646.01(2). It is funded by

---

[3] These amounts match precisely the minimum liability coverage that health care providers are required to maintain under § 655.23(4).

mandatory contributions from a broad spectrum of insurers,[4] and provides "back-up" coverage to a maximum of $300,000 per claim. § 646.31(4).

¶ 6. The Patients Compensation Fund (PCF) provides liability coverage on medical malpractice awards exceeding the $400,000 coverage required under § 655.23(4), or the amount of coverage actually maintained by the provider, whichever is greater. Wis. Stat. §§ 655.27(1). It is funded by annual assessments paid by health care providers. § 655.27(3).

¶ 7. Summarizing the statutory scheme, the court of appeals stated:

> WHCLIP provides an insurance plan of last resort for those health care providers entitled to but unable to obtain liability coverage; WISF exists to fill the breach left when a liability insurer goes into liquidation by providing coverage up to $300,000 [per claim]; and PCF provides coverage when a medical malpractice award exceeds $400,000. As is apparent, when WISF and PCF are harnessed in tandem, they do not provide full coverage but leave a $100,000 "gap."

Unpublished op. at 3.

¶ 8. The relevant facts of this case are undisputed. William J. Faber, D.O., is an osteopathic physician and surgeon practicing in Milwaukee. Between January of 1988 and December of 1992, Faber was insured against health care provider's liability by the Professional Medical Insurance Company (Pro-Med), a Missouri-based insurer licensed to do business in Wisconsin. In October of 1992, Pro-Med advised Faber that it would not renew his policy, but offered noncancelable extended reporting coverage ("tail" cov-

---

[4] *See* §§ 646.01(1), 646.11(1).

erage). Faber purchased the tail coverage for the period January 1, 1988 through December 31, 1992.[5]

¶ 9.   In April 1994, the Deputy Receiver of Pro-Med, which was now in liquidation, notified Faber by letter that the company was canceling his tail coverage policy. The Wisconsin Insurance Security Fund (WISF) stepped in to provide coverage of up to $300,000 on each of three pending claims against Faber. On June 14, 1994, Faber requested that WHCLIP provide retro-active insurance coverage to: 1) replace his canceled tail coverage; and 2) close the $100,000 gap existing between the $300,000 maximum coverage furnished by WISF and the $400,000 minimum coverage that he was statutorily required to carry.

¶ 10.   On September 26, 1994, WHCLIP denied Faber's request for coverage. WHCLIP determined that it was not created to provide coverage in situations in which a health care provider's lack of coverage is occasioned by the insolvency of an insurer. WHCLIP concluded that Faber's loss of coverage was appropriately addressed by WISF, which was created to provide coverage in the event of insurer insolvency.

¶ 11.   Faber sought review in the circuit court. The circuit court reversed WHCLIP's determination that the latter lacked authority to issue the insurance coverage sought by Faber, and ordered WHCLIP to process Faber's application for coverage. WHCLIP appealed.

¶ 12.   Essentially adopting the position of WHCLIP, the court of appeals reversed the circuit court's decision. It concluded that the statutory framework under which WISF was created would be

---

[5] The tail coverage insured Faber indefinitely for liability arising from his acts or omissions occurring between the specified dates.

undermined by requiring WHCLIP to provide the coverage requested by Faber. Faber petitioned this court for review.

¶ 13. The sole question before us is whether WHCLIP is obligated to provide retroactive liability coverage to a health care provider lacking coverage by virtue of insurer liquidation.[6] This court reviews under a *de novo* standard a legislatively created entity's determination of its own statutory authority to act. *Wisconsin Patients Compensation Fund v. WHCLIP*, 200 Wis. 2d 599, 606, 547 N.W.2d 578 (1996); *Wisconsin Power & Light v. Public Serv. Comm.*, 181 Wis. 2d 385, 392, 511 N.W.2d 291 (1994).

¶ 14. In urging us to conclude that WHCLIP is required to process his application for liability insurance coverage, Faber makes the following arguments: 1) the legislature fully integrated the statutory health care liability insurance scheme without WISF; and 2) the statutory scheme is not undermined by requiring WHCLIP to close the $100,000 gap between WISF and PCF coverage.

¶ 15. It is true that WISF was created after WHCLIP and PCF. However, this does not compel the conclusion that WISF operates outside of the statutory scheme of back-up medical malpractice insurance. We presume that the legislature enacts laws with full knowledge of existing statutes. *Milwaukee v. Kilgore*, 193 Wis. 2d 168, 183, 532 N.W.2d 690 (1995).

¶ 16. As WHCLIP notes, the statutes and administrative rules demonstrate an integration between

---

[6] We deny the motion of WHCLIP to supplement the record, because its proposed additions to the record are not germane to our analysis of the dispositive issue in this case.

WISF and the other statutory coverage plans. For example, the legislature has made the Commissioner of Insurance chairperson of the Board of Governors of WHCLIP and PCF, and has placed the Commissioner on the board of directors of WISF. §§ 619.04(3), 655.27(2), 646.12(1). Also, the Administrative Code provisions governing WHCLIP make specific reference to WISF.[7]

██

¶ 17.    This court finds unpersuasive Faber's argument that requiring WHCLIP to close the $100,000 gap between WISF and PCF coverage will not undermine the statutory back-up coverage scheme. Instead, we determine that the legislature intended to limit Faber's recourse to the coverage provided by WISF in order to preserve the financial integrity of each coverage plan. If WHCLIP is required to extend coverage to health care professionals who lose coverage through insurer liquidation, little incentive will remain for those professionals to pursue claims under either WISF or against insolvent insurers who wrongfully repudiate policies.[8] Essentially, WHCLIP would be forced into the business of reinsuring failed insurers. We conclude that the resulting financial burden on WHCLIP, and corresponding windfall to WISF and liquidating private insurers, is not consistent with the intent of the legislature.

---

[7] Wis. Admin. Code § Ins 17.35(2m) provides:

[T]he Wisconsin insurance security fund is not available for payment of claims if this risk retention group becomes insolvent.

[8] While the record before us is not clear on the issue, we note that WHCLIP asserts that Faber may have some recourse in the Missouri courts against Pro-Med.

¶ 18.    Requiring WHCLIP to provide insurance to health care professionals who lose coverage as a result of insurer liquidation would have the perverse effect of requiring WHCLIP to "buy claims," i.e., to insure against claims that have already occurred. For example, Faber presently has three pending claims that would otherwise have been covered under the Pro-Med policy. Those three claims are each covered by WISF, but only up to $300,000. Thus, when Faber asks this court to require WHCLIP to extend tail coverage and to close the $100,000 gap between WISF and PCF coverages, he is requesting that WHCLIP be forced to "insure" against claims that have already occurred and are in litigation. We cannot conclude that the legislature intended such a result.

¶ 19.    There is nothing in Chapters 646, 655, or the Administrative Code expressly forbidding WHCLIP from offering coverage in this situation or limiting Faber to WISF coverage. However, we discern in the statutory scheme a distinction between health care provider liability coverage deficits caused by market failure, and lack of coverage caused by the insolvency and subsequent liquidation of an insurer. WHCLIP is addressed to the former circumstance, and WISF to the latter.

¶ 20.    WISF was expressly created to address precisely the situation present in this case—the loss of insurance coverage occasioned by insurer liquidation. § 646.01(2)(a). On the other hand, WHCLIP was established to deal with the general unavailability of certain kinds of health care provider liability insurance.

> Since malpractice insurance for health care providers became increasingly difficult to obtain in the voluntary market, certain categories of health pro-

fessionals such as physicians and osteopaths were unable to obtain liability insurance. Granting the Commissioner the authority to create risk-sharing plans for health professional liability insurance, which requires all liability insurers to participate, avoids this situation. Since the purpose of creating such plans is to alleviate the problems of lack of availability of malpractice insurance, not to require insurers to assume the costs of malpractice suits and administrative expenses, the premiums charged to the policyholder are to be adequate, to the extent possible to ensure that the plan is self-supporting.

*Medical Malpractice Legislation Passed by the 1975 Wisconsin Legislature*, Staff Paper #1 of the Malpractice Committee, Wisconsin Legislative Council Reports 1, 4 (1976).

¶ 21. Faber did not suffer a loss of insurance due to a failure of the voluntary insurance market to offer the coverage that he is required by statute to carry. Instead, his lack of coverage was caused by the liquidation of his insurer. We determine that the legislature has established WISF coverage as the only recourse in such a situation, which provides Faber with $300,000 of coverage for each claim falling under the provisions of the Pro-Med policy.

¶ 22. The WISF coverage is less comprehensive than that offered by WHCLIP, and as a result, Faber faces potential exposure to $100,000 on each claim that would otherwise have been covered under the Pro-Med policy. It appears from the record that Faber finds himself with insufficient coverage through no fault of his own. However, the legislature's failure to establish a seamless system of back-up health care provider liability coverage cannot serve as the basis for applying WHCLIP to a situation reserved for the WISF.

¶ 23. We conclude that the legislature intended that WHCLIP and WISF apply in different contexts, and that in the present case, the latter applies. While Faber faces potential economic hardship in the absence of WHCLIP coverage, the gap in coverage between the WISF and PCF is one that has been created by, and must therefore be addressed by, the legislature.

*By the Court.*—The decision of the court of appeals is affirmed.